Argued March 7, affirmed March 28, 1951

# TIMBER STRUCTURES, Inc. *v.*
# C. W. S. GRINDING & MACHINE WORKS, a Corp.

229 P. 2d 623

*Bert S. Gooding,* of Portland, argued the cause for appellant. On the briefs were Stott & Gooding, of Portland.

*R. W. Nahstoll,* of Portland, argued the cause for respondent. On the brief were Eben, Jones & Nahstoll, of Portland.

Before BRAND, Chief Justice, and HAY, LUSK, LATOURETTE and TOOZE, Justices.

TOOZE, J.

This is a suit by Timber Structures, Inc., as plaintiff, against C. W. S. Grinding & Machine Works, an Oregon corporation, as defendant, to foreclose a lien for labor on lots 5 and 8, block 78, Couch's addition to the city of Portland. From a decree in favor of plaintiff, defendant appeals.

Plaintiff is a Delaware corporation, with its main plant and home office located in Portland. It also operated a plant in Seattle. It is chiefly engaged in designing, fabricating, and erecting structural timbers, including those of substantial size and load capacity. A large portion of its operation is devoted to pro-

duction of laminated beams of the type involved in this suit.

Defendant is the owner of lots 5 and 8, block 78, Couch's addition to the city of Portland, and in March, 1946, one C. Ed Rath was the builder under a contract with defendant for the construction of the building known as "C. W. S. Grinding & Machine Works" on said lots. As a part of such construction certain beams and columns were necessary.

On March 14, 1946, Rath placed an oral order with one William E. Welch, a salesman for plaintiff, for certain laminated and sawn beams and columns. Upon receiving such order the first step taken by plaintiff was to have its engineering department prepare drawings showing required size, length, and load·capacity of the proposed beams and columns. These specifications were approved by Rath. Thereupon, a sales order was prepared, dated March 30, 1946. The price agreed upon for the labor and materials involved was $4395.00. Later, a change in the size of the laminated beams was agreed upon, and the contract price was thereupon reduced $491.00, leaving a final contract price of $3904.00.

The order placed by Rath called for the following:

| Item No. | Quantity | Description |
|---|---|---|
| "1 | 7 | Glued laminated beams designed for 20' spacing, 40# live load, 10# dead load, 7000# concentrated load at any point, size—14¾" x 29¼"—50' |
| "2 | 1 | 12"x18"—18' Sawn Beam |
| "3 | 2 | 12"x18"—16' Sawn Beams |
| "4 | 3 | 10"x12"—16' Columns |
| "5 | 2 | 8"x 8"— 8' Columns" |

The contract, as shown on the sales order, also included the following:

"All necessary hardware needed for complete erection of the above material.

"All erected in place as per Timber Structures, Inc., drawing #7963-1, * * *

"Lumber in glued laminated beams to be dry and suitable for glueing, Para. 215 or Btr., Douglas Fir.

"Erection based on truck crane operation inside building."

The structural timbers above described were not carried by plaintiff in stock, and they had to be specially built and adapted to the particular needs of the building being constructed for defendant. The material for the sawn beams and columns called for by the contract had to be purchased by plaintiff for this particular job. By scientific determination the timbers were designed to satisfy the needs of the particular building in terms of the smallest dimensions and the least material that would accommodate the load capacity, and also satisfy the other requirements of the building.

What is involved in the fabrication of a laminated beam, as well as in the making of the sawn beams and columns, is best described in the testimony of D. F. Kinder, secretary of plaintiff corporation.

He testified:

"The engineering department determines the proper size of the beam to carry the load that's called for, then it is determined the most economical shape of that beam to carry such a load, the width and the depth and so forth in their relations; after that it is determined the type of lumber that is required, whether it is all high stress grade or whether some other grade may be used for the reason that,

from an engineering standpoint certain sections of the beam require a higher grade of lumber and a higher stress is developed in certain sections than in other sections. Next is determined the size of the individual pieces that go into the beam, whether they should be nominal one inch or whether they should be nominal two inch and so forth and the widths to use to make them, also the number of laminations. After that is all determined, the stock is selected from a stock pile or the material is ordered and developed for the job by the proper drying, with the proper moisture control clear through. And the surfacing—that is it is necessary that to do the proper job in gluing the surface must be smooth. The next thing is the scarfing, to make a long board out of a number of short ones.

"* * *

"Scarfing? Scarfing is beveling the ends of a board of a slope of 1-12 so that the beveled ends of two boards are laid together and during—in that space of sixteen or eighteen inches they are glued together which makes a board the same thickness at the splice. It is splicing boards together and in that method of scarfing so that the board is the same thickness at all places. After that the boards are spread with glue, run through a glue spreader and laid up in clamps and left for the required period of time after which they are taken out of the clamps and they are put through the surfacer, through a planing mill or a planer. From there they go to the fabricating shed and are trimmed and bored to take the fittings and connections to fasten them into the final job according to the details that are made by the engineering department, and that's about it.

"* * *

"Q. And what is your process of drying the lumber used in the manufacture of laminated beams?

"A. It is by the latest Moore circulating dry kilns.

"Q. * * * How do you negotiate the dressing of this lumber after it's been dried and selected for a particular job; is that done by machine?

"A. That is put through a planer, yes.

"Q. And then you've said that after the faces are dressed that the glue is spread on them. How is that glue spread, Mr. Kinder?

"A. Well, it is put through a glue spreader made especially for that, with large rolls faced with rubber, with corrugations, to determine the proper amount of glue that goes on, and run by power. The board is run through the glue spreader and the glue is spread on one side or two sides, whichever is required."

The witness then testified that the laminated beams weigh slightly less than sawn beams, and that each of the laminated beams weighed approximately five thousand pounds.

Describing the process of fabricating the sawn beams and columns, the witness testified:

"Fabrication of lumber, solid lumber, is not different than the fabrication of the glue beam after it is once glued, but the first step would be following the engineer's detail. If there is a quantity there would be a pattern made for each item, a beam marked so and so, a column marked so and so, and there would be a pattern made for that. The order goes to the yard for some—so many pieces of a certain size and material of a certain length and a certain grade; that material is brought into the shop and from that pattern it is fabricated. It is sawn to the proper length, it is put—the daps are made into it where they are called for, the boring is made and the grooves for the timber connectors are made and so forth and it is shaped, and whatever manner is necessary to fit the job as shown on the drawings.

"Q. Now, you have at your own plant here the machinery for the dressing of these timbers prior to the time that they are glued?

"A. Yes.

"Q. And for planing them and surfacing them after these five thousand pound beams are made?

"A. Yes.

"Q. And those were used in the production of the beams which filled this order?

"A. That's right."

It appears from the evidence that before this order was placed with plaintiff, it had suffered a fire in its Portland plant, making it necessary to transfer all its laminating facilities to its Seattle plant. As a result, the lumber involved in the production of the laminated beams was surfaced, scarfed, and glued in Seattle, but the final fabrication and surfacing were done in Portland.

There is substantial evidence in the record to establish the fact that these beams and columns were produced by plaintiff in accordance with the contract, also, that they were transported to the job site, and by the use of a crane, were erected by plaintiff in the building being constructed for defendant.

On March 14, 1947, and within the time provided by statute, plaintiff filed in the office of the county clerk for Multnomah county, its subcontractor's notice of mechanics' lien, claiming a lien upon the building for the reasonable value of the materials furnished and labor performed by plaintiff, alleged to be the sum of $3962.60. The lien notice was in the usual form and met all the requirements of the statute. The claim in the lien notice was itemized as follows:

"To Labor and Materials furnished and delivered in construction of building of C W S Grinding &

Machine Works at 1110 N. W. Flanders St., Portland, Oregon, as follows:

"*Materials:* Timbers, lumber, hardware
and misc. _____ 1223.75
"*Labor:* Plant labor _____ 2522.48
Job site labor _____ 94.37
Trucking to site _____ 72.00
Crane hire at site _____ 50.00

"Balance Due Claimant: _____$3962.60"

It appears from the evidence that plaintiff failed to give the notice to the owner or reputed owner of the property upon which such building was constructed that it had commenced to deliver materials for use thereon as required by statute as a condition precedent to the right to assert a lien for such materials; and hence on the trial, plaintiff abandoned its claim for the reasonable value of the materials as above set forth.

The evidence conclusively establishes the fact that plaintiff had not received any payment from Rath, the contractor, or from defendant, or anyone else, for the materials furnished or labor performed.

Defendant's first assignment of error is directed to the testimony of one Andrew Kreipe as to the reasonable value of the plant labor. Kreipe is the chief estimator for plaintiff. He made an estimate for the purpose of pricing this particular job before the original contract price was agreed upon. In March, 1947, after the work was fully performed, he made another estimate of the reasonable value of the labor and materials employed in completing the job. He testified that the reasonable value of the materials was $1223.75, and that of the plant labor, $2522.48.

According to the witness, plaintiff handled in excess of one thousand different jobs a year of the type

involved in this litigation. On each of such jobs it was Kreipe's business to make estimates of the costs of material and labor necessary before a bid for the work was made. He was able to do this from an examination of the drawings showing the requirements for the particular job. He referred to the drawings in this case in giving his testimony.

In calculating the reasonable value of the plant labor involved in this case, as in other cases, the witness took into consideration not only the actual wages paid employes engaged on this particular job, but also a proportion, based on plaintiff's experience in production, of plaintiff's costs of supervision, engineering, and other overhead, including depreciation of tools and machinery, as well as a fair profit on the operation.

■ Inasmuch as the "reasonable value" of the plant labor performed is the criterion for measuring the amount for which a lien may be claimed in this case, rather than the actual "costs" thereof, it is immaterial whether such actual costs were more or less than the reasonable value. *Christman v. Salway et al.,* 103 Or. 666, 205 P. 541.

■■ Kreipe was a well-qualified expert in his line. He knew from his examination of the drawings in this case what materials were required and what labor was necessary in order to produce these beams and columns, and he knew what proportion of plaintiff's overhead costs should be charged to this particular job and was fully qualified to express an opinion as to the reasonable value of both plant labor and materials. At least, the trial court was satisfied with his qualifications. It is well established that the qualification of a witness to testify as an expert is primarily a question for determination by the trial court, and its determina-

tion will not be disturbed on appeal except when there has been a manifest abuse of discretion.

In most cases where the question is one of reasonable value, expert testimony is not only admissible, but in many instances, it is indispensable. In a case like this, the opinion of the expert must be based upon a knowledge of what was done, but such knowledge may come to him in ways other than through the use of a hypothetical question. From his extensive experience in estimating the costs of production of beams and columns of the sort involved here, this witness could no doubt express a more accurate opinion from an examination of the drawings, than he could from a hypothetical question based largely upon such drawings. The fact that the witness did not personally observe the performance of all the work done merely goes to the weight of his testimony, not to its admissibility. The court did not err in receiving this testimony. *Stonebrink v. Highland Motors, Inc., et al.,* 171 Or. 415, 425, 137 P. 2d 986; *Carnine v. Tibbetts,* 158 Or. 21, 37, 74 P. 2d 974; *Porter Construction Co. v. Berry et al.,* 136 Or. 80, 298 P. 179; *Goldfoot v. Lofgren,* 135 Or. 533, 539, 296 P. 843; *Pennebaker v. Kimble et al.,* 126 Or. 317, 330, 269 P. 981; *Smith v. Gevurtz & Sons,* 67 Or. 25, 135 P. 190.

The Oregon authorities cited by defendant in support of its contention that this testimony was incompetent, though they correctly state the law applicable to the facts before this court in those cases, do not sustain its position here and may easily be distinguished.

As its second assignment of error, defendant claims the trial court erred in its refusal to sustain the motion for nonsuit on the ground of a total failure of proof of the material allegations of the complaint.

Disregarding the fact that a motion for a nonsuit is inappropriate in an equity case, we will treat it as a motion to dismiss.

■ As its first point under this assignment of error, defendant asserts that plaintiff failed to make a definite showing as to the value of the labor performed, and, in addition, claims that the evidence fails to show that the beams and columns were erected in and became a part of the building under construction. These claims are without merit.

There is substantial evidence in the record tending to show the reasonable value of the labor performed. In fact, that evidence stands undisputed, because the defendant elected to rest its case without producing any evidence whatever upon any of the issues. Also, there is substantial evidence in the record tending to show the erection of these beams and columns in the particular building under construction for defendant, and this evidence is undisputed. No building other than the one constructed for defendant on lots 5 and 8, block 78, Couch's addition to the city of Portland, is directly or indirectly referred to in the record. Kinder testified that the beams and columns were erected in the building as a part thereof. In its proof, plaintiff fully met the requirements of §§ 2-227 and 2-301, O.C.L.A.

By its assignment of error numbered III, defendant contends the trial court erred in entering decree for plaintiff on a lien claim containing nonlienable items.

Under this assignment, defendant urges the theory that there can be no valid lien for labor *except that performed directly upon the actual structure or building involved.* It also contends that inasmuch as the

several items of overhead expense heretofore mentioned are in and of themselves nonlienable, the inclusion of a proportionate amount thereof in estimating the reasonable value of the plant labor, for which the lien is claimed, renders the lien invalid.

Upon the first proposition asserted, defendant's contention may best be stated by quoting from its brief as follows:

"The question of construction of Section 67-101, O.C.L.A., supra, is most important in this suit to determine whether or not the process of *laminating* lumber into structural beams was intended to come within the scope of 'performing labor upon * * any structure.' It is to be noted that the word 'labor' is restricted and qualified to performance upon *any structure*. It was intended to have a limited meaning and scope, and apparently the Legislature had only in mind those who performed actual physical labor upon the structure. After defining the beneficiaries, said statute goes on to substantially provide that they 'shall have a lien upon the same (any structure) *for the work or labor done*.' No reference is made nor provision for labor or work in the manufacture of materials. Materialmen or manufacturers are separate beneficiaries and are protected, but under a different procedure, the effect of which, plaintiff is attempting to avoid for failure to send the required materialman's statutory notice."

Section 67-101, O.C.L.A., in part provides:

"Every mechanic * * * contractor * * * laborer * * * and other persons *performing labor upon or furnishing material,* or transporting or hauling any material of any kind to be used in the construction, alteration or repair, either in whole or in part *of any building* * * * *or any structure* * * * shall have a lien upon the same *for the work or labor done* * * * or material furnished at the

instance of the owner of the building * * * or his agent * * *." (Italics ours.)

We agree with defendant that the right to a lien is purely statutory, and a claimant to such a lien must in the first instance bring himself clearly within the terms of the statute. The statute is strictly construed as to persons entitled to its benefits and as to the procedure necessary to perfect the lien; but when the claimant's right has been clearly established, the law will be liberally interpreted toward accomplishing the purposes of its enactment. *Drake Lumber Co. v. Lindquist et al.,* 179 Or. 402, 170 P. 2d 712; *Phillips v. Graves et al.,* 139 Or. 336, 9 P. 2d 490.

Under the statute, Rath, as the general contractor in charge of constructing the building for defendant, was defendant's statutory agent, and as such was authorized to bind the property of the defendant in so far as a right to a lien under the lien law is concerned for the labor performed or materials furnished in the construction of the building. Plaintiff, as a subcontractor, clearly came within the designation of persons entitled to a lien.

We cannot subscribe to defendant's construction of the statute. We construe the statute to mean that any person who performs labor *"upon materials"* designed for and actually used in the structure is entitled to a lien for such labor, and that the *lien benefits are not confined to those who actually perform labor upon the structure itself.* The construction we place upon the statute answers the principal contention of the defendant in this case.

Neither do we deem it material to the right to a lien for labor performed upon materials, whether such labor be performed at the job site, or in the plant

of the lien claimant in the city where the building is located, or in its plant in any other city, within or without the state. The only question is whether the materials upon which the labor is performed were designed for and actually used in the particular structure or building involved. The rule is well stated in 2 Jones, Liens (3d ed.), 551, § 1324, as follows:

> "A lien may sometimes be established for work done away from the premises, if it be done *upon articles which are intended for use in the building, and are actually used in its construction or repair.* In such case the labor is to all intents and purposes performed in the erection, alteration or repair of a building within the terms of the statute. Where, for instance, the inside finish for a house is sawed, planed, or molded at a mill, or the doors or windows are made at a carpenter shop, or the iron-work is prepared at a blacksmith's shop, away from the premises, but really as a part of the work of construction, and the materials upon which such work is done actually becomes a part of the building, a lien arises for such labor equally with the labor performed upon the land on which the house is erected." (Italics ours.)

See also 57 C. J. S., Mechanics' Liens, 531, § 39.

The beams and columns involved in this case were not stock items. They had to be specially made to fit the particular requirements of the building in question. Their construction involved the expenditure of labor and material. Where labor is performed and material is furnished for the construction of a particular item designed expressly for and used in a building or other structure, a lien may be claimed for the reasonable value of the labor performed separate and apart from the reasonable value of the material incorporated into the finished product. *Scannell et al. v. Hub Brew-*

*ing Co.,* 178 Mass. 288, 59 N. E. 628; *Evans Marble Co.
v. International Trust Co.,* 101 Md. 210, 60 A. 667, 109
A. S. R. 568. This rule does not apply, however, when
the transaction is in fact a sale of a finished product.
But under the facts of this case, plaintiff had a right
to a lien for the reasonable value of the labor it per-
formed in carrying out its contract, though owing to
its failure to give the required statutory notice, it had
no lien for the materials.

■ We do not agree with defendant's contention
that the lien here is invalid on the theory that nonlien-
able items are included in the claim for the reasonable
value of the plant labor performed. In fixing the rea-
sonable value of the plant labor furnished by plaintiff,
it was proper to take into consideration cost items other
than the direct expenditures in wages to employes actu-
ally engaged in the particular work.

■■ It must be kept in mind that the product of
plaintiff's labor in this case was the result of a certain
highly skilled and complicated process employed, re-
quiring the use of machinery, the power to operate such
machinery, a house in which to carry on such opera-
tions, engineering, and other incidental expense wholly
apart from the cost of the raw material, as well as the
direct expense of skilled labor. Labor, within the
meaning of the lien statute, is no less labor because it
is carried on with the use of expensive machinery in-
stead of hand tools, and its reasonable value is not
determined simply by the out-of-pocket payments by
the employer to the employe. Plaintiff, as a subcon-
tractor, *furnished labor* for this particular building
*of a special kind* for the special purposes and needs
of the structure. The question is what is the reasonable
value of this particular labor, not some other. To be
able to furnish this sort of labor, plaintiff was required

to construct a plant, buy and install machinery, purchase power to operate the machinery, carry insurance, pay taxes, employ engineers, and incur other expenses. It also had to consider the profit and loss angle of its operations. *All of such expenses are a part of making this particular labor available and are increments of its value.* Based upon its operating experiences as a whole, plaintiff could accurately and properly determine the aliquot portion of its total overhead that should be distributed to the amount of labor expended upon this particular unit of work in determining its reasonable value. Because plaintiff considered these expenses in fixing the reasonable value of the particular labor involved, it did not have the effect of including the same in the charge for labor as separate items. As separate items they would be nonlienable. But these items, together with direct wages paid employes, were simply the factors considered in determining reasonable value.

In 40 C.J., Mechanics' Liens, 77, § 56, the rule is stated:

"Profits and commissions are not lienable items, unless included in the contract price \* \* \* *or unless included in the reasonable value of the labor* or materials furnished, as where the actual cost is less than the reasonable worth." (Italics ours.)

See also *Shaw v. Rackensack Apartment Corporation,* 174 Ark. 492, 295 S.W. 966.

█ If the reasonable value of labor for which a lien may be claimed were to be confined to actual wages paid by employer to employe, there would be few, if any, employers in the contracting field who could long remain in business. The statute gives a right of lien to a contractor for labor performed. That contem-

plates labor performed by others in the employ of the contractor, not necessarily his own personal labor. Due to the methods the contractor employs, and the machinery he uses in the performance of this labor, the reasonable value of the labor furnished contemplates much more than the actual wages paid.

Taking into consideration costs and expenses of operation in addition to direct wages paid in determining the reasonable value of a particular service rendered is not at all peculiar, nor limited, to the contracting business. In our own profession that is done. The lawyer, in fixing his fee for a particular office service such as advice, drawing a deed or will, or a contract, necessarily takes into consideration his overhead expenses such as office rental, stenographic and law clerk hire, office supplies, telephone costs, etc., in addition to his own or his employe's actual personal service and time employed. The same is true of doctors, dentists, engineers, barbers, beauty parlor operators —in fact, of practically every profession or business engaged in furnishing personal services to others. Because this is done would certainly not in and of itself render the charge unreasonable, nor as being a charge for other than personal services. The ultimate question would be whether the fee as charged was a reasonable fee for the service performed, not what was taken into consideration in fixing it. Evidence of actual costs of direct labor employed upon any particular job may, in some instances, be admissible as a part of the proof of reasonable value, but such costs are never controlling in a case of the kind now before the court.

In *Paget v. Peters et al.*, 133 Or. 608, 619, 286 P. 983, 289 P. 1119, this court approved the inclusion of the cost of casualty insurance in and as a part of the reasonable value of the labor performed.

In *Barr v. World Keepfresh Co.*, 77 Or. 95, 99, 150 P. 747, the court approved the inclusion of board furnished as a part of the reasonable value of the labor performed. The court said:

"In keeping his accounts, Mr. Barr made the memorandum of board and expenses which were paid for as a part of the cost of the labor performed and materials furnished in constructing the dryer, and simply charged as board and expenses. It enhanced the cost of the structure, but was purely the compensation for the labor and materials.

"*\* \* \* Board and expenses, when considered as used in the construction of a building, are nonlienable, but when they are a part of the reasonable compensation paid for the labor and materials, it is otherwise.*" (Italics ours.)

See also *Allen v. Elwert*, 29 Or. 428, 44 P. 823, 48 P. 54; *Willamette Falls Transportation & Milling Co. v. Remick*, 1 Or. 169.

In *Sampson Co. v. Commonwealth et al.*, 202 Mass. 326, 336, 88 N.E. 911, the court stated:

"We are also of opinion that the use of a pile driver by the plaintiff's men does not deprive him of his lien for their labor. In many kinds of mechanical work on buildings, workmen use not only simple tools, but machines of greater or less complication. The use of tools and machines which wear out in the use does not give a right to a lien for their value as materials. \* \* \* If it be assumed that no lien arises for the value of the use of a machine, apart from the labor of those who use it, we are of opinion that the use of tools and machines, controlled by workmen, rendering their labor upon a building or other structure more effective and valuable than it would be if it were performed with their hands alone, does not defeat a claim for a lien for labor in the operation of such a machine as a pile driver."

In *Potter Manufacturing Co. v. Meyer & Co.*, 171 Ind. 513, 516, 86 N.E. 837, the court held:

> "*A lien is authorized in favor of a laborer to the extent of the value of the work done by him.* This trench machine, owned by appellant, did not work automatically, but was operated by men in the employ and under the direction of the lessee of the machine, J. J. Smith & Company. There could be no question that the contractor, J. J. Smith & Company, might have acquired a lien to the extent of the value of the work done, *including that done by this labor-saving machine.*" (Italics ours.)

See also *Gill v. Mullan,* 140 Md. 1, 5, 116 A. 563; *Ellis-Mylroie Lumber Co. v. Bratt,* 119 Wash. 142, 205 P. 398.

Manifestly, plaintiff's "line" method of processing these custom-fabricated structural timbers is not only an efficient way of producing the same, but also is economical; and, in the final analysis, the customer reaps the benefit of this economy in operation by way of a reduced price. Instead of having an employe at the job site spread with a hand brush the glue on the laminae prepared for assembly into a laminated beam (though at times plaintiff has done some of this work at the job site), the glue is spread with a power-driven set of rollers in a small fraction of the employe's time. Direct labor costs are thereby substantially reduced.

■ Defendant also objects to the allowance of the claim for crane hire in the sum of $50. The use of the crane was necessary to the erection of these heavy beams and columns in the building, and such use was contemplated by the original contract; it was a method of transportation inside the building. The evidence shows the charge to be reasonable. We hold that this was a lienable item.

■ In its final decree, the trial court allowed plaintiff's claim for labor and transportation in the sum of $2,608.25. On this appeal, plaintiff claims that in fixing the amount due as $2,608.25, there was an error in computation, and that the correct amount is $2,680.25. Plaintiff requests us to make this correction. But inasmuch as plaintiff did not file a cross-appeal from the decree, that matter is not properly before us.

■ Plaintiff also invites attention to the fact that though its statement of costs and disbursements on the trial in the sum of $91.80 was duly filed and no objections were made thereto, the said sum was not inserted in the final decree, and suggests that we now order the entry to be made. The entry in the decree of the amount of costs and disbursements taxed and allowed on the trial is a ministerial act and should have been, and may yet be, performed by the clerk. No order of this court is necessary for the purpose.

The decree is affirmed.