William F. DANNEMILLER, David H. Kennedy, Charles H. MacMahon, John H. Steward and Labyrinth Ltd., Appellants,

v.

AMFAC DISTRIBUTION CORPORATION, d/b/a AMFAC Supply of Alaska, Appellee.

No. 2895.

Supreme Court of Alaska.

July 8, 1977.

H. Russel Holland, Holland & Thornton, Anchorage, for appellants.

Jacob H. Allmaras, Garretson & Jarvi, Anchorage, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR and BURKE, JJ., and DIMOND, J. Pro Tem.

DIMOND, Justice Pro Tem.

This case involves a claim of lien by AMFAC against 34 modular units and against a leasehold estate of land in Valdez upon which the modular units are situated. The lien was asserted against appellants, Dannemiller, et al., who have the leasehold interest in the land and Labyrinth, Ltd., who owns the 34 modular units. The trial court found that AMFAC had a lien in the amount of $19,606.93 and that the 34 modular units and the leasehold estate were subject to the lien. Dannemiller, et al. and Labyrinth, Ltd. (hereafter referred to as appellants) appealed, claiming trial court error because:

(A) AMFAC sold on "open account," without reliance on the liened property;

(B) AMFAC failed to adequately prove that $19,606.93 worth of its materials in fact ended up in the 34 modular units and;

(C) The 34 modular units were not sufficiently annexed to the land to subject the leasehold to a lien.

We affirm the trial court on all of the above issues.

## FACTS

AMFAC Distribution Corporation, d/b/a AMFAC Supply of Alaska (AMFAC), is a construction supplier which supplies plumbing and electrical materials. AMFAC's materials were sold to Lampert Automated Homes, Inc. (Lampert), who manufactured the modular units involved in this case.

After the 34 modular units were manufactured by Lampert in Anchorage, Alaska, they were shipped to Valdez, Alaska for housing related to the pipeline terminal. The materials supplied in this case were allegedly incorporated into the "Valdez project", which was designated by AMFAC as Job No. 6900. After manufacturing and delivering the 34 units to the Valdez plant, Lampert, due to financial difficulties, went out of business. In September 1974, AMFAC filed a lien against the 34 modular units as well as against the land they were placed upon. AMFAC then filed a complaint in superior court requesting a judgment against Lampert Automated Homes, as well as a claim on the lien against the 34 units and land.[1]

The 34 modular units were manufactured by Lampert at the request of Alaska Valdez Development Company by a contract dated February 20, 1974 (six units) and modified by a contract on April 15, 1974 (60 units). Alaska Valdez paid Lampert in full for the 34 units delivered. Alaska Valdez is a limited partnership. Alaska Valdez sold 32 of these units to Labyrinth, Ltd. (Labyrinth). Title to 32 units ultimately vested in Labyrinth; title to two units ultimately vested in Alaska Valdez.

These units were delivered to Valdez and placed on the Valdez property. The fee simple title to the Valdez property belongs to defendant David Kennedy in his personal capacity. Kennedy's land was leased to Rivers Construction Company. Rivers Construction assigned all of its interest to Keystone Development Company. Keystone, in turn, sublet the land to Dannemiller, et al.

Various trial stipulations significantly narrow the focus of this appeal. To begin with, it was stipulated that:

materials supplied to Lampert and used in the Valdez project. The Jerdes were parties to the trial below but are not parties to the appeal in this case. The parties have agreed that the outcome of the Jerdes' lien will be determined by the outcome of this court's ruling regarding AMFAC's claimed lien. This appeal focuses on AMFAC's arguments only.

---

1. Walter and Ruth Jerdes, d/b/a Northern Supply Co., also became part of the superior court litigation. They supplied "smoke gard" units which were incorporated into the 34 units and for which they were never paid. On August 16, 1974, they also filed a claim of lien against the 34 units and the land in order to secure payment for money owed them.

On May 19, 1975, the Jerdes filed suit for judgment and execution on the lien for $5,626.10 in

. . . if there is a lien, that it is a lien against the subleasehold interest of the 4 individuals, Dannemiller, MacMahon, Steward and Kennedy and . . . against the interest of Labyrinth, Limited, in the 34 trailer units. Not, however, against the fee interest of David H. Kennedy.

The parties further agreed as to the scope of the leasehold interest which was lienable as including a lease which runs "to 1978" with an "option to extend to 1984". The parties further stipulated that:

. . . the claim of lien of AMFAC . . . accurately describes the property on which these 34 units are in fact sitting . . .. [the leasehold interest]. . . . We're stipulating that the property that is the subject of the sublease . . . is the same property as tracts or lots . . . as stated in the lien . . ..

Therefore, it is established that, should a lienable interest exist, the lien would include the 34 units or the leasehold interest of the land upon which the units are situated or both. Lampert failed to appear at trial, and default judgment was entered against Lampert. After several days of trial, the trial court entered a memorandum decision holding that AMFAC had a valid lienable interest in the 34 units as well as in the leasehold estate.

### (A) WAS THERE A LIENABLE INTEREST?

■ The first question raised relates to whether AMFAC sold on an "open account", or with reliance on the 34 modular units and leasehold estate. AMFAC sold materials to Lampert under a billing procedure which is indicated by the record as follows: Dieter Steinborn, credit manager for AMFAC, testified that, originally, Lampert had one general account, although within this one general account Lampert had "requisition numbers" determining the jobs where the materials went. These numbers were used "as their accounting function so they knew where the material was going . . ." Steinborn was not initially aware of the Valdez project until Lampert began falling behind on its payments, but then knew specifically about the project. At all times that products were sold, however, it appears that the products sold could be traced via the 6900 designation number of the Valdez project, and this number, according to Steinborn, was intended to be used strictly for the Valdez project. According to Steinborn, the counterman who made each sale to Lampert was to find out where the goods were to go and knew more of the specifics of the Valdez project than he did. Steinborn stated that he had no intent to ever waive any lien rights. The purpose of the Number 6900 was stated as follows:

The main reason that I tried to keep everything separate was in case it came up to where we did have to lien a job so we would have everything separated. We could account for all the materials.

. . . Our understanding was that the materials, you know, after they were being manufactured, they were going to Valdez.

Appellants argue that, while AMFAC had general knowledge that the goods were intended for Valdez, AMFAC never really verified that any of the materials sold actually made it into Lampert-built units, which went to Valdez. All goods were delivered to Lampert, and none was delivered directly to Valdez; AMFAC never inspected the units and doesn't know if they were ever completed or not. There were other Lampert jobs simultaneously being worked on in Bethel, Barrow, Skookik, Koyuk and Oomiak, and Steinborn stated that he did not know if they were being built by Lampert as pre-sold units or on speculation. Steinborn did not originally know of the specific place in Valdez where the goods ended up, and no legal property description was kept of the Valdez project. At trial, however, appellants, while alluding to "other projects", did not introduce any evidence showing AMFAC materials actually went into "other projects". On this issue, the trial court found that:

Defendant Lampert constructed the units for the benefit of Alaska Valdez Development Co., charging all material to a specific work order identifying this particular contract . . ..

16. From the testimony of Kurt von Dohrmann, who was employed by Lampert Automated Homes, Inc., and from the testimony of Dieter Steinborn, credit manager for Amfac, it appears that a conscientious effort was made to designate the project destination of materials sold by Amfac to Lampert. Each of the projects has a job designation of its own, which is inserted on the individual invoices describing the goods sold. Mr. Steinborn testified to the effect that at no time did Amfac indicate an intention to waive any rights under the lien laws of this state and that he expected that Amfac could rely on the security afforded by the lien laws of this state in the event of a default in payment for the materials by the purchaser Lampert.

Appellants claim that, given the above-stated facts as a matter of law, AMFAC's procedures establish an "open account" sale without reliance on a lienable interest. AMFAC claims it relied on the lien laws as security for its sale.

The recent case of *University of Alaska v. Simpson Building Supply Co.*, 530 P.2d 1317 (Alaska 1975), is cited by both parties and correctly lays out the guidelines on this

point. In *Simpson, supra,* the University of Alaska contracted with Northwest to build 96 modular townhouses. Northwest then contracted with Simpson for pre-cut timber. When Northwest folded, Simpson attempted to foreclose a lien against the University for the cost of materials supplied. The University made an identical argument to Dannemiller's, claiming that Simpson had sold on an "open account" without any reliance on a lienable interest in specific property. This court stated:

> The University of Alaska contends that if it is shown a materialman relied solely on the credit of his purchaser, he may not assert a lien against the building in which the materials are incorporated. *On the other hand it is well established if the materialman relies on both the credit of the purchaser and the security of the building, the materialman can assert a lien.* (Emphasis added, footnotes omitted.) (This language corrects the version of two sentences in the original text.)[2]

AMFAC therefore has a lienable interest if AMFAC relied both on the credit of Lampert as well as the security of the modular units and land upon which they were placed in Valdez. The issue before this court, therefore, is whether the trial court was clearly erroneous in finding such a reliance by AMFAC.[3]

We note that the facts of this case, supporting a lienable interest, do not appear as

2. More specifically, the court in *Simpson, supra* at n.5 cited *Mutual Lumber Co. v. Gero,* 244 A.2d 564, 586 (Me.1968), with approval stating:

> The supplier must be able to offer satisfactory proof from whatever sources may be available that he furnished the materials for use in the particular building, relying in part upon the credit of the building and not wholly upon the credit of the contractor or other person, and that the materials were in fact used in the particular building on which a lien is claimed.

*See also Layrite Products Co. v. Lux,* 91 Idaho 110, 416 P.2d 501, 505 (1966), where the court said:

> Where materials are furnished for use in a particular building, the fact that the materialman looks first or primarily to the contractor for payment and only subsequently to the building for security, would not of itself defeat the lien. (citations omitted)

3. This court will not set aside a finding of fact of a trial judge unless it is clearly erroneous. *Day v. A & G Constr. Co., Inc.,* 528 P.2d 440 (Alaska 1974); *Larman v. Kodiak Elec. Ass'n,* 514 P.2d 1275 (Alaska 1973). A finding is clearly erroneous when, although there may be evidence to support it, we are left with a definite and firm conviction on the entire record that a mistake has been made. *A.R.C. Industries, Inc. v. State,* 551 P.2d 951 (Alaska 1976); *A & G Constr. Co., Inc. v. Reid Brothers Logging Co., Inc.,* 547 P.2d 1207 (Alaska 1976); *Peters v. Juneau-Douglas Girl Scout Council,* 519 P.2d 826 (Alaska 1974). We must also give due regard to the trial court's opportunity to judge the credibility of the witnesses. *Hendricks v. Knik Supply, Inc.,* 522 P.2d 543, 547 (Alaska 1974); *Amick v. Metro. Mort. & Securities Co.,* 453 P.2d 412, 415 (Alaska 1969).

substantial as in *Simpson, supra* at 1320. Nevertheless, our review of the record convinces us that the trial court was not clearly erroneous in its determination that AMFAC relied on the lienable interest in the units and leasehold estate. AMFAC had a number system by which it could trace where the materials went when sold, and this system was established for lien purposes. The trial court's finding that AMFAC made a "conscientious effort" to designate the project destination of materials is supported by the testimony of Steinborn, which articulates the intent of AMFAC in using the 6900 designation.

We note appellants' claim that Steinborn arguably contradicts himself when he states that he did not know if the units were built on speculation. However, this asserted contradiction in testimony, if it exists, goes to the weight of Steinborn's testimony, which must be considered in light of all the evidence and resolved by the trial court. We do not find the trial court's resolution of this issue to be clearly erroneous and, therefore, affirm on this issue.

## (B) METHOD OF COMPUTING VALUE OF MATERIALS

As a method of estimating damages, AMFAC advanced the following formula in the superior court: AMFAC claimed that $34,398.12 was the value of unpaid debts after subtracting payments made by Lampert. This amount was allegedly for material for the 60 units ordered under the Valdez project. Since only 34 units were delivered to the Valdez property, AMFAC took ³⁴/₆₀ths of $34,398.12 and came up with damages of $19,606.93. The trial court agreed and found:

12. The amount of the plaintiff's asserted claim originated from invoices with the 6900 job designation, totalling $37,375.16. Of this amount, the plaintiff has admitted that $2,977.04 has been paid, leaving a balance due of $34,398.12.

13. Although the witness Kurt von Dohrmann in his deposition testified that materials for all 60 of the units contracted for fabrication were not ordered at the outset, but were rather being ordered in sufficient quantities only to provide materials for the on-going fabrication, Amfac has claimed a lien for 34–60ths of the balance due for materials sold. The explanation for this approach is that it would conservatively state the amount due for materials incorporated into the fabrication of the units delivered on the property in Valdez assuming all of the materials required for all 60 units had been purchased. The amount claimed by Amfac as adjusted is $19,606.93 in principal.

14. Taking the testimony as a whole and the conservative position taken by Amfac with regard to the dollar amounts asserted, it is more likely than not that materials of reasonable value of at least $19,606.93 were incorporated into units fabricated and delivered to the property described in Valdez.

Appellants' first claim is that the above method has failed sufficiently to link AMFAC's materials to the Valdez project. Appellants do "not contend that none of the AMFAC property was incorporated into the Alaska Valdez units". However, the argument is that AMFAC has the burden of proving the value of the materials and has failed to meet this burden.

The precise questions before this court, therefore, are: (1) whose burden is it to show the value of the AMFAC materials, which were incorporated into the Valdez project, (2) how accurate must the estimates of damages be, and (3) is there sufficient evidence in the record to support the trial court's findings?

The answer to the first two of the above questions appears already determined by *University of Alaska v. Simpson Building Supply Co.*, 530 P.2d 1317 (Alaska 1975). In that case, this court viewed a similar claim as to whether materials were actually incorporated into a building site claimed under a lien. *Simpson* established that a materialperson must demonstrate that the materials furnished were generally incorporated into

the building or project.[4] The court in *Simpson,* however, also defined the extent of the materialperson's burden as follows:

> In the foreclosure of a materialman's lien, it has been held that the materialman should not be required to watch the progress of a structure to see that every piece of material supplied by him was used therein, and that, if some of the material has been used elsewhere, it rests with the defendant to show that fact. [Quoting In *State ex rel. Trojan Powder Co. v. Johnson Contract Co.,* 120 Or. 633, 253 P. 521 (1927).][5]

The above language establishes that, while AMFAC does have a burden to show by a preponderance that its materials were generally used in a project, it need not show that each and every item was incorporated. This reflects the practical reality that a supplier cannot possibly be expected to supervise the destination of each piece of material it supplies, or in the alternative rip apart the completed structure prior to collecting on its lien. This result is also consistent with general concepts of damages which establish that, while an injured party may not speculate as to the extent of injury, "some items of damages cannot be fixed with mathematical precision".[6]

The question remains whether there is sufficient evidence to support the trial court's conclusions that AMFAC has met its burden.

Viewing the evidence of this case, we note that, in the published deposition of Mr. von Dohrmann, Lampert's purchasing agent went through all of the 6900 (Valdez project bills) and determined which bills represented materials which, in his opinion, were incorporated into the Valdez project. These determinations were made partly from memory and partly from notations such as "6900" and "shipped to Valdez". According to von Dohrmann, AMFAC was Lampert's primary supplier for plumbing and electrical supplies, although other sources existed. Von Dohrmann also stated that, during the time the materials were delivered by AMFAC, the Valdez project was the "primary project . . .. So most[,] and I use the term generally[,] was for this particular project." While a separate project, the "Fluor" project, overlapped somewhat with the Valdez project, some of the plumbing fixtures were of a different quality than the 6900 Valdez project, and it appears that the bulk of the Valdez units had already been shipped prior to the real initiation of the Fluor project.

There was conflicting testimony from one Lampert employee, Mr. Schoech, which indicated that it is difficult to determine how much of the materials ordered for the Valdez project actually went into the Valdez project. There was also testimony from Mr. Schoech which indicated that, due to tight credit, the 6900 number may have been used to order materials for other jobs.

The weight to be given Schoech's testimony and the weight to be given any conflicts with von Dohrmann's testimony, if they exist, are matters which are within the discretion of the trial court to resolve. Von Dohrmann's testimony, based on his examination of AMFAC's business records and identification of invoices, appears to have been preferred by the trial court, and this testimony supports the trial court's ruling.

Based on this evidence, we hold that AMFAC met its burden of showing its materials were generally incorporated into the Valdez project. Appellants did not introduce specific evidence showing that AMFAC's materials went elsewhere. We cannot, under these circumstances, hold the trial court's findings to be clearly erroneous, and we therefore must sustain its ruling.

---

4. *University of Alaska v. Simpson Bldg. Supply Co.,* 530 P.2d 1317, 1321 (Alaska 1975); *Timber Structures, Inc. v. C.W.S. Grinding & Machine Works,* 191 Or. 231, 229 P.2d 623 (1951); *State ex rel. Trojan Powder Co. v. Johnson Contract Co.,* 120 Or. 633, 253 P. 520 (1927).

5. *University of Alaska v. Simpson Bldg. Supply Co.,* 530 P.2d 1317, 1321–22 n.11 (Alaska 1975).

6. *Morrison v. State,* 516 P.2d 402 (Alaska 1973).

■ Appellants next attack the use of the $^{34}\!/_{60ths}$ formula for computing the value of the materials actually incorporated into the Valdez units. We reject appellants' claim that this test was not fair. Appellants admit that, if Lampert had not ordered for all 60 units, the use of the $^{34}\!/_{60}$ths is really to appellants' advantage. The trial court agreed, calling this estimate conservative.

On the other hand, appellants claim that $^{34}\!/_{60}$ths could work to its disadvantage as well. This argument is based upon the supposition that some of the materials charged to the 6900 account really went to places other than Valdez. The trial court, however, found there were sufficient billings and proof to tie in $34,398.12 of AMFAC's materials to the Valdez project. This finding is supported by the evidence, and appellants have not shown any evidence which specifically ties AMFAC materials to other projects. Whether or not the trial court believed that any material billed under the 6900 number really went to other projects is a matter for resolution by the trial court; and as already indicated, its finding is not clearly erroneous.[7]

We therefore find that the $^{34}\!/_{60}$ths formula employed by the trial court fairly estimates the value of the materials incorporated into the Valdez project.

### (C) WERE THE VALDEZ UNITS "ANNEXED TO THE REAL ESTATE"?

■ Appellants claim that these modular units are not sufficiently annexed to the real estate for purposes of AS 34.35.055 so as to create a lienable interest in the leasehold estate. AMFAC argues to the contrary. AS 34.35.055 states:

*Land subject to lien.* (a) The land upon which a building or other improvement described in § 50 of this chapter is constructed, together with a convenient space about the building or other improvement or so much as is required for the convenient use and occupation of it (to be determined by the judgment of the court at the time of the foreclosure of the lien) . . . is also subject to the lien created by §§ 50–120 of this chapter . . .

The purposes of extending a statutory lien to the land is because the value of the land is increased when a materialperson provides labor or material for a structure which is attached to the land. The lien should extend to the land, which is benefited by the materialperson.[8] To determine whether or not the modular units are sufficiently attached to the Kennedy leasehold estate, we will look to the following elements:

(1) physical annexation,

(2) adaption to use with real property,

(3) intention to annex to realty,

(4) relationship of the claiming parties,

(5) the relative difficulty of removal,

(6) the nature of the article annexed, and

(7) whether the fact of the annexation is open and apparent.[9]

The above seven elements are really factors which this court considers to determine the primary factor—the intent of the parties. We agree with AMFAC that the objective intent of the immediate parties controls where AMFAC was not a direct party to the decisions surrounding the Valdez plan.

The question of fixture or chattel remains one of fact . . .. However, it becomes one of objective intent rather than subjective. "Of course it is true . . . that generally the intent of the

---

7. Appellants' objection to the $^{34}\!/_{60}$ths formula, based on the inventories found at Lampert's after Lampert went out of business, is without merit. As AMFAC points out, there is nothing in the record to indicate the value of these inventories. These inventories could represent the remaining $^{26}\!/_{60}$ths of materials supplied by AMFAC for the 6900 project. If that were so, the $^{34}\!/_{60}$ths approach would not overvalue the damages in anyway.

8. *Paget v. Peters,* 133 Or. 608, 286 P. 983 (1930). This Oregon case interprets the lien statute of Oregon, which is the basis for Alaska's statute.

9. *Cornell v. Sennes,* 18 Cal.App.3d 126, 95 Cal. Rptr. 728 (1971); *Kruse Metals Mfg. Co. v. Utility Mfg. Co.,* 206 Cal.App.2d 176, 23 Cal. Rptr. 514 (1962).

parties is a controlling criterion in ascertaining whether property is permanently attached to the land or retains its identity as personalty. This applies between the immediate parties to a transaction, such as mortgagor and mortgagee, vendor and vendee, etc., and their successors in interest. But where, as here, the rights of a person unconnected with that transaction are concerned, and who is without actual or constructive notice concerning the intent of the parties responsible for annexing the personalty to the realty, the question is not so much the intent of such parties as *the apparent intent as it would reasonably appear to such third person.*" (Citations omitted) (Emphasis added in *Kruse* ) *Kruse Metals Mfg. Co. v. Utility Mfg. Co., supra,* 23 Cal.Rptr. at 518.

The decision of "intent" and "annexation" is one of fact, which involves the credibility and balancing of all the relevant evidence as well as the application of the above legal considerations. Given the above legal standards, we must decide whether the trial court was clearly erroneous in its determination that the objective intent of the parties was that the modular units were to be annexed to the leasehold estate.

Looking to the facts of this case, the record reflects that the modular homes could not move on their own or be pulled by an automobile. The Lampert units were prefabricated in the Anchorage factory and had to be transported by special trucks and placed in position on wooden cribbing via crane. The transport truck was a specially designed vehicle, which expanded to carry each unit and then retracted to place the unit in place. Each individual unit was designed to be moved by crane.

The units were placed two next to each other and then the two units were connected (on location) with pre-fabricated building materials to make a breezeway between them. The two units were then connected to form one fourplex—two apartments in each unit. The fourplexes were connected to conventional sewer, water, electricity and fuel. The units were movable by disassembling the connecting breezeway, disconnecting utility hook-ups and moving the individual units by crane and truck. The modular units were taxed and financed as realty.

Appellant Kennedy testified that it was his intent to move the units after the completion of the pipeline terminal to less expensive land. On the other hand, while it appears that these units were designed to create the option of moving them, Kennedy also stated that the units might not be moved if not economically advantageous to do so. Appellants further note that the leasing arrangement was for a short term, to 1978, with a short-term option to renew, to 1984, and that the leasing arrangements required the lessee to remove all "above ground improvements" from the leasehold estate at the termination of the lease.

The trial court, based on the above evidence, held:

All of the evidence that was presented convinced the Court that to the world, the structures were attached to the realty. It would very well be that the secret between the lessor, lessee and owners of the units and real estate might be otherwise but the apparent intent to third persons reasonably appears to be an improvement to real estate.

The trial court then concluded in its memorandum opinion that:

3. The improvements installed on the property in Valdez serve as residential housing and appear from photographs submitted as evidence to be a part of the realty, and from the voluminous testimony on this issue, I find that the units have become a part of the realty and subject to the lien statute 34.35.050.

We cannot say that, based on the above evidence, the trial court was clearly erroneous in its finding that the units were sufficiently attached to the land. The trial court properly applied the correct legal standards by focusing on the objective intent of the parties. The trial court's con-

clusions are supported by the evidence in the record.[10]

In summary, the trial court's ruling that AMFAC has sufficiently established a lienable interest in the modular units and leasehold estate is affirmed in all aspects. We realize that this is essentially a dispute between two innocent parties. On one hand, AMFAC has delivered materials and services without pay. On the other hand, Dannemiller, et al. may end up paying twice for the value of these materials. Both parties could have been more cautious. Among possible courses of action, AMFAC could have taken steps to perfect security interests with Lampert, and appellants could have required a performance bond from Lampert to insure Lampert's payment. This court need not, however, balance the equities in this case, for in our opinion, the Legislature, in passing AS 34.35.050, has legislatively resolved the conflict by making a materialperson's lien available. In our opinion, the results of this case are the most consistent with the legislative objectives of AS 34.35.050.

The decision of the trial court is AF-FIRMED.

---

10. Appellants claim the trial court mistakenly assumed that Labyrinth (the owners of the 34 modular units) had a *leasehold* interest in the Valdez property and that the assumption that Labyrinth both owned the units *and* leased the Valdez land, improperly affected the trial court's findings relative to "annexation to the realty". Even assuming that Labyrinth in fact had no leasehold interest, we are not persuaded by appellants' argument. To begin with, the trial court stated that Labyrinth "had acquired the Keystone development interest in the land . . .." Contrary to appellants' claim, the trial court did not say that this was a "leasehold" interest. Since the units were on the leasehold estate, the trial court was at least correct that Labyrinth appeared to have at least a possessory interest in the land. The distinction we draw between a leasehold and a possessory interest is further reflected by the trial court's statement "However, considering the relationship of the lessor, lessee, and owners of the units . . .." This language indicates the trial court's awareness that the owners of the units (Labyrinth) and the lessee of the land, were distinct parties.

Secondly, even if the trial court did mistakenly assume that Labyrinth had a leasehold interest, this would, in our opinion, have little relevance to the objective intent of the parties. To the objective observer even if Labyrinth did not have a "leasehold" interest in the land, it would appear as if the owners of the units had some interest which permitted the units to be placed on the land. Under these circumstances, even were error to exist, we would consider the error harmless.