**D.H. BLATTNER & SONS, INC., Appellant and Cross–Appellee,**

v.

**N.M. ROTHSCHILD & SONS, LTD., Appellee and Cross–Appellant.**

Nos. S–9729, S–9749.

Supreme Court of Alaska.

Sept. 20, 2002.

Rehearing Denied Nov. 5, 2002.

R. Eldridge Hicks, Hicks, Boyd, Chandler & Falconer, LLP, Anchorage, for Appellant and Cross–Appellee.

Spencer C. Sneed and Jahna M. Lindemuth, Dorsey & Whitney, LLP, Anchorage, for Appellee and Cross–Appellant.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

At issue in this appeal are a series of claims by two creditors regarding their entitlement to the liquidated assets of a defunct gold and silver mine in western Alaska. After the mining operation failed, both D.H. Blattner & Sons, Inc. and N.M. Rothschild & Sons, Ltd. brought separate lien enforcement and foreclosure actions in the superior court. In cross-motions for summary judgment, each party claimed that its own liens are valid and have priority. The superior court ruled that to the extent that Blattner's liens are valid, they have priority over Rothschild's liens. But the superior court awarded an amount substantially less than Blattner initially requested and ordered that the balance of the liquidated assets be paid to Rothschild.

Blattner appeals, alleging that the superior court erred in its definition of "work," its assignment of a protection payment to only one type of lien, and its award of attorney's fees to Rothschild. Rothschild cross-appeals, alleging that the trial court erred by attaching Blattner's lien to a Colorado bank ac-

count and allowing the lien to secure wages for managerial employees. This case requires us to apply cases and statutes adopted in Alaska's territorial days to a modern mining operation. We partially affirm the decision of the superior court and remand the case for further proceedings consistent with this opinion.

## II. FACTS AND PROCEEDINGS

In December 1994 USMX of Alaska, Inc. acquired two state mining leases, known jointly as the Illinois Creek Gold Mine, on land east of Kaltag in the Mt. McKinley and Nulato Recording Districts. In 1995 USMX formulated a five and one-half year plan to build and operate an open-pit gold and silver mine and leaching pad on the site. Blattner won the bid for providing the necessary mining and earthwork services, finalizing a contract with USMX to that effect on March 11, 1996. Blattner began work immediately. The work included: furnishing all labor and supervision; providing tools; equipment, and heavy machinery; construction and maintenance of temporary facilities; and other steps necessary to develop the mine and leaching pad. The date on which Blattner ceased working is in dispute.

USMX entered a credit agreement with Rothschild on July 11, 1996, under which Rothschild advanced USMX approximately $19.5 million. USMX secured its loan through a deed of trust, to which a pre-existing service contract between USMX and Blattner was attached. USMX filed for protection under Chapter 11 of the United States Bankruptcy Code on May 21, 1998 and limited its mining operations to leaching and processing minerals that had already been stockpiled in the "heap." With the consent of both Blattner and Rothschild, USMX in a separate action surrendered the mine, heap, and all equipment to the State of Alaska on July 12, 1999. The proceeds from the sale of gold and silver acquired from the heap have

been deposited in a Norwest Bank Colorado account. This account now contains approximately $2.3 million in assets. After obtaining relief in United States Bankruptcy Court from the automatic stay provisions of 11 U.S.C. § 362, Blattner began this lien enforcement and foreclosure action in superior court on July 21, 1998. Rothschild obtained similar relief and began its lien foreclosure on November 2, 1998. The two cases were consolidated on January 15, 1999.

Blattner recorded four sets of mining liens and dump liens,[1] each of which alleged $1,923,483.55 in unpaid debt. The first set of liens was recorded on January 22, 1998 and included amounts due at that time for unpaid work at the mine. The second set, recorded July 31, 1998, claimed equipment standby costs owed to Blattner through July 1998 as part of the contract terms with USMX. The third set of liens, recorded on December 1, 1998, covered additional equipment standby costs from July to November 1998. On April 8, 1999, a fourth set of liens was recorded, claiming accelerated fixed equipment costs that could no longer be recovered "because USMX now had breached and abrogated the mining contract by moving to dismiss the bankruptcy proceedings."[2] Through a stipulation agreement approved by the bankruptcy court on August 10, 1998, Blattner and Rothschild each received an "adequate protection payment" of $500,000. The trial court appointed a receiver to take possession of the remaining liquid assets, cash proceeds, and gold and silver from the mine, valued at the time at $2,481,000.

Blattner filed a complaint requesting compensation for the "full balance due under the contract," which Blattner claimed to be $1,923,483.55. Rothschild responded with a motion for partial summary judgment, asserting that its deed of trust had priority over Blattner's liens and that Blattner's dump lien was limited to costs accrued in production of the dump. Blattner in turn

---

1. Because the mine covered two recording districts, each lien filing—i.e., each set of liens—included an identical lien filing in each recording district. In order to avoid confusion, Blattner's two lien filings on each of four occasions will be referred to collectively as "Blattner's dump lien," except where differentiation of the lien filings is

necessary. The issue of the four occasions on which liens were filed addresses standby costs, which will be discussed in Part IV.B.2.

2. The bankruptcy cases were dismissed on February 26, 1999 on the motion of USMX.

filed a cross-motion for partial summary judgment, asserting that it possessed valid liens on the dump and the mining claims for a total of $7,373,000. Quoting AS 34.35.930, the superior court, Judge Richard D. Savell presiding, maintained that liens should be "liberally construed." The superior court then ruled that to the extent that Blattner's liens are valid, they have priority over Rothschild's liens. The superior court held Blattner to be a "person" entitled to file a lien under AS 34.35.140. The superior court further ruled that Blattner could include in its dump lien labor other than that directly involved in the extraction of minerals from the mine. However, the superior court concluded that Blattner could not include non-labor charges, such as those for materials, equipment rental, and standby time, in its lien. Blattner was permitted to include interest charges on allowable claims in its lien. The superior court then restricted Blattner's valid liens to the two dump liens filed on January 27, 1998 during the earthmoving phase of the mining operation. Furthermore, because mining work stopped on January 10, 1998, the superior court held that Blattner's dump lien is limited by AS 34.35.145 to work performed only within the previous nine months. The superior court also ruled that the $500,000 protection payment must be applied against Blattner's dump lien rather than against other purported liens.

In its final judgment and findings of fact and conclusions of law, Judge Savell found that Blattner was owed $549,872 for labor costs but reduced this amount by the $500,000 Blattner had already been paid via the protection payment. The court then added interest on the account,[3] resulting in a total award to Blattner of $74,538. This amount was to be obtained from the deposit account in Colorado derived from the sale of gold and silver from the dump. Rothschild was entitled to the remainder of the deposit account. Rothschild sought and was later granted attorney's fees of $230,500 pursuant to Alaska Civil Rule 82(b)(1).

Blattner appeals and argues that the superior court erred (1) in finding that Blattner ceased work at the mine in November 1997; (2) in denying recovery for standby costs; (3) in limiting the definition of "work" in AS 34.35.140 to work performed by humans; (4) in limiting recovery to work performed at the mine site; (5) in applying the $500,000 protection payment to Blattner's dump lien; and (6) in refusing to award Blattner reasonable attorney's fees for foreclosing a lien. Rothschild rejects each of these contentions and further argues in its cross-appeal that the superior court erred in attaching Blattner's dump lien to the proceeds from the dump and in allowing Blattner to recover for the wages of supervisory employees.

## III. STANDARD OF REVIEW

■ Appeals from summary judgment are reviewed de novo;[4] they are upheld when the record shows no genuine issues of material fact and the movant is entitled to judgment as a matter of law.[5] Statutory interpretation is a matter of law for which the court uses its independent judgment.[6] A statute must be interpreted "in light of the purposes for which it was enacted,"[7] mindful of the "common usage" interpretation the language conveys to others.[8]

## IV. DISCUSSION

In his memorandum opinion dated November 30, 1999, Judge Savell reached seven conclusions regarding Blattner's and Rothschild's motions for partial summary judgment. They are presented verbatim below:

1. To the extent Blattner has asserted valid and allowable claims in its dump lien, that lien is superior to and preferred over Rothschild's Deed of Trust.

3. Rothschild does not challenge the award of interest on lien charges.

4. *Sonneman v. State,* 969 P.2d 632, 635 (Alaska 1998).

5. *Ellingstad v. State, Dep't of Natural Res.,* 979 P.2d 1000, 1004 (Alaska 1999).

6. *Progressive Ins. Co. v. Simmons,* 953 P.2d 510, 512 (Alaska 1998).

7. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 904 (Alaska 1987).

8. *Id.* at 905.

2. Blattner is a "person" entitled to file a dump lien under AS 34.35.140.

3. Blattner's lien may include work of the nature described in AS 34.35.140(a) and any of the kinds of work mentioned in AS 34.35.125. Blattner need not prove that covered work produced the minerals against which the lien is claimed.

4. Blattner's dump lien may only include costs and charges for labor; non-labor charges, such as for tools, materials, equipment rental, and standby time, may not be included and recovered under a dump lien.

5. Interest charges on Blattner's allowable claims may be included in a judgment upon lien foreclosure.

6. The only dump liens claiming charges for labor are the two filed and recorded January 27, 1998. The lien may only include unpaid charges for the work performed within the nine months immediately preceding January 10, 1998.

7. The $500,000 "adequate protection payment" received by Blattner in August 1998 must be applied first to claims properly included in and secured by Blattner's January 27, 1998, dump lien.

For the reasons provided in the remainder of this opinion, we affirm conclusions 1–3 and 5–7.[9] With regard to conclusion 4, we affirm the exclusion from the lien of charges for materials but reverse on the exclusion of charges for tools and equipment. We further hold that anticipated standby charges are lienable for the nine-month period prior to January 10, 1998, pursuant to AS 34.35.145.[10]

Judge Savell clarified and supplemented his findings on May 16, 2000. The four conclusions of law provided:

1. The dump lien under AS 34.35.140 secures only amounts due for "labor." The dump lien under AS 34.35.140 does not secure amounts due for materials, tools, supplies, equipment, standby, or any other non-labor items.

2. The dump lien under AS 34.35.140 secures only amounts due for labor in, on, or about the mine site. The dump lien under AS 34.35.140 does not secure amounts due for labor distant from the mine site.

3. The dump lien under AS 34.35.140 secures amounts due for the labor of all persons who performed labor in, on, or about the mine site, including those whose labor is supervisory or managerial in nature.

4. The dump lien under AS 34.35.140 does not secure charges for profit or overhead or any other non-labor charges.

We affirm conclusions 2 and 3. We partially reverse conclusion 1 to include tools, supplies,[11] and equipment costs within the dump lien; anticipated standby costs may also be included for the nine months prior to the cessation of work. We affirm conclusion 4 to the extent that it excludes charges for profit or overhead but reverse its blanket exclusion of all non-labor charges.

### A. Blattner's Dump Lien, to the Extent that It Is Valid, Attaches to the Colorado Bank Account.

As a threshold issue, we must determine whether the dump lien claimed by Blattner attaches to the money in the Norwest Bank Colorado account. Because the mine, dump, and all equipment have been transferred, with the consent of both Blattner and Rothschild, to the control of the State of Alaska, the only remaining property in dispute is the approximately $2.3 million in the account.

Rothschild asserts that Blattner's dump lien does not attach to the Norwest

9. Conclusions 2 and 5 are not challenged upon appeal. Conclusion 7 is subject to remand for further findings on the types of liens possessed by Blattner.

10. Other standby charges may be recoverable under a contract measure. This issue, however, is not presently before the court.

11. We understand supplies to be different from materials. Supplies are those items necessary to the maintenance of the working environment, such as food and fuel. Materials are those items and resources used in the construction of the contracted-for project; examples would include lumber and cement.

Bank Colorado account because the funds in the account do not fall under the scope of AS 34.35.140, which provides to those who work on a dump or well a lien "on the dump or mass, and the gold, gold dust, or other minerals contained in or extracted from it." Rothschild admits that the cash in this account is derived from the sale of gold and silver from the dump obtained from the mine.[12] The processing of the dump to refine the gold and silver for sale was performed by a third party at a site not part of the mine.

Rothschild asserts that the dump lien created by AS 34.35.140 does not reach to the proceeds from the sale of minerals extracted from the dump. Rothschild bases its argument on the provision in AS 34.35.140(b) that the dump must remain "in one mass" and the corresponding definition in AS 34.35.170(a)(1) of "dump" or "mass" as minerals "while in mass at the mine or on the mining claim or adjacent to it." Rothschild contends that because the dump lien only attaches to the dump while it is at the mine site, once the dump leaves the mine site, even if only to be processed, there can be no dump lien on the dump and consequently no dump lien on the proceeds generated by processing the dump. Under Rothschild's logic, any lien that Blattner has on the dump has been effectively terminated, especially since what remains of the physical dump is now under the control of the state.

Because of the wording of the stipulation agreements to which both Blattner and Rothschild were parties, it is not necessary for us to reach the legal issue raised by Rothschild. Rothschild argues that, in addition to its dump lien, Blattner is asserting a lien on the cash proceeds. Rothschild speculates that Blattner is basing this new lien either on the stipulation agreements allowing USMX to spend part of the dump proceeds to maintain the account and service its bankruptcy proceedings or on the stipulated order granting the receiver the ability to spend money from the account. Blattner, though, claims no such liens. The stipulation agreements contain provisions clearly meant to protect any pre-existing liens that each party had on the dump and to transfer those liens to the proceeds derived from the dump. Indeed, a statement to this effect is contained both in the USMX stipulations[13] and in the receivership stipulation.[14] Such statements would not be necessary, and in fact would be inappropriate, if the dump lien did not attach to the account covered by the stipulation agreements. This signals a respect for old liens, not the creation of new ones. By signing on to these stipulations, Rothschild

---

12. Later in its brief, Rothschild alleges that there is no evidence to support the superior court's finding that the proceeds in the account "came entirely from the heap and were not comingled [sic] with minerals or proceeds from any other source." In a motion for summary judgment, all factual inferences must be drawn in favor of the party opposing summary judgment. *Makarka v. Great American Ins. Co.*, 14 P.3d 964, 966 (Alaska 2000). However, this requires sufficient evidence from which the court can draw its conclusions. Rothschild supports its claim of error with an affidavit given subsequent to the February 28, 2000 hearing that generated the disputed order. Rothschild explains its lack of prior briefing by asserting that it had no way of anticipating that the commingling issue would be raised. However, in a March 30, 2000 order denying reconsideration of summary judgment in light of the affidavit, Judge Savell pointed to statements made by Rothschild's lawyer at the February hearing in which the lawyer asserted that there had been no commingling of funds. Given the information before it and the lack of evidence to the contrary at the time it ruled on the summary judgment motions, it was not clear error for the trial court to find that there was no commingling of funds.

13. "The parties reserve all rights with respect to, and acknowledge and agree that, their claims, rights and liens, if any, in the Cash Collateral shall continue with the same priority, dignity and effect, post-petition, as these claims, rights or liens existed on the Petition Date in the production from operations. Nothing herein, however, shall be construed or considered an agreement as to the extent, validity, priority or dignity of any of the parties' claims or liens, if any. All rights with respect thereto are reserved."

14. "Any monies generated by further processing of the existing heap shall be subject to the respective liens of Blattner and Rothschild to the same extent and with the same priority such liens presently have with respect to the existing heap and proceeds therefrom." This exact language was also included in the superior court order approving the November 1998 budget to administer the processing of the heap pursuant to the ongoing bankruptcy proceedings.

conceded that Blattner's dump lien attached to the Norwest Bank Colorado account.

Furthermore, Rothschild previously expressed the belief that Blattner's liens, to the extent that they are valid, do attach to the account. In a hearing in August 1998 before the United States Bankruptcy Court for the District of Colorado, to negotiate what would eventually become the Fourth Stipulation Agreement and the $500,000 "adequate protection payment," Rothschild agreed with the characterization of the proceedings by Blattner that the hearing was to make no findings on the priority of the liens that either side had with regard to the dump. Implicit in the conversation was the assumption that the liens did in fact attach to the account. The same sentiment was expressed in an evidentiary hearing in superior court when Rothschild stated that "the cash and the heap together are feeding themselves ... there's no deterioration of that batch of collateral." This statement was made after a long discussion by the lawyer for the receiver for the account about how money generated by processing the heap "shall be subject to the respective liens of Blattner and Rothschild" and how Blattner's primary concern is "protecting its interest in the receiver's $2 million of cash." In both instances, Rothschild made no argument that Blattner did not have any right to the money in the account in the first place. A reasonable conclusion would be that Rothschild believed Blattner did have such rights.

Thus, we hold that Blattner's dump lien, to the extent that it is valid, attaches to the Norwest Bank Colorado account derived from processing the heap because of the language in the stipulation agreements and the conduct of the parties.

## B. The Definition of "Work" Under AS 34.35.140

Most of the major issues in the case center around an interpretation of AS 34.35.140, which governs liens on a dump or a mass of minerals.[15] Considering the historical importance of mining for precious metals and the present importance of oil drilling to the Alaska economy, there have been surprisingly few cases in recent years involving the interpretation of this statute. Indeed, most of the important cases remain from Alaska's territorial days. Technological advances in the mining industry and overall changes in the conduct of business in this state since those times require us to adapt the language in those cases to modern times. At the same time we must respect the underlying principles embodied in those cases and the statutes upon which they relied.

### 1. The definition of "work" under AS 34.35.140(a) includes some equipment costs.

The provision for determining who can have a dump lien is found in AS 34.35.140(a), which assigns such a lien to a "person" who performs "work" on the dump for "the amount due the laborer in the production of the minerals." The issue before us is how to interpret the terms "person," "work," and "laborer."

The superior court ruled that Blattner was a "person" for the purposes of AS 34.35.140 and therefore could sue to enforce a lien. The court reasoned that the definition of "person" in the general provisions of Alaska's statutes applies because AS

15. AS 34.35.140 provides:

(a) A person who, at the instance of another who has the right of possession of a mine, or mining claim, oil or gas well, performs upon, in, or about the mine or well any of the kinds of work mentioned in AS 34.35.125, or who performs any other kind of work in the production, piling up, or storing of a dump or mass of mineral, has a lien on the dump or mass, and the gold, gold dust, or other minerals contained in or extracted from it, to secure the amount due the laborer in the production of the minerals.

(b) The lien attaches to the dump or mass, and to the gold, gold dust, or other mineral, whether they are deposited on the ground in a mass, or dumped into bunkers or hoppers, or stored in tanks or reservoirs, or placed in sluice boxes at the mine, and attaches to the gold, gold dust, and other minerals so long as they are in one mass and can be identified as being produced by the labor of the lienor.

(c) The lien provided for in this section is prior and preferred over a deed, mortgage, bill of sale, attachment, or other claim whether given before or after the work for which the lien is claimed is started.

34.35.170, which defines terms in the mines and wells section of which AS 34.35.140 is a part, does not define a "person." Consequently, the superior court concluded, one must look to AS 01.10.060(8), which provides definitions applicable to all Alaska statutes, to see that the definition of a "person" includes corporations. Because the Alaska Legislature did not restrict the definition of a "person" to "natural persons," the superior court ruled that this more inclusive definition of a person applies. The superior court noted that the legislature elsewhere establishes the priority of mechanic's and materialman's liens for an "individual" [16] defined as a "natural person." [17] No such definition was provided with regard to dump liens. The superior court also noted that the interpretation of corporations as being included with the definition of a "person" is consistent both with a 1921 Ninth Circuit timber lien case interpreting Alaska law [18] and with other Alaska decisions allowing corporations to claim liens.[19]

▮ Rothschild does not challenge the status of Blattner as a "person" for the purposes of AS 34.35.140. Instead, Rothschild contends that even if Blattner can recover a lien, the amount of the lien cannot be more than the value of the work performed by the individual laborers. This in essence limits the definition of "work" under AS 34.35.140(a) to mining activities performed by humans. Blattner, on the other hand, asserts that equipment-related costs, including materials, should be included in the definition of "work." Blattner argues that such a holding is necessary for a liberal interpretation of the phrase "any other kind of work" in AS 34.35.140(a).[20] Blattner further contends that companies will be much less willing to provide their services, especially for financially risky mining operations, if mining companies are not allowed to recover liens for equipment and related costs.

· The superior court gave two explanations for holding that the lien was limited to charges for labor. Neither of these explanations supports the conclusion reached by the superior court. First, the court reasoned that to include equipment and material costs in the lien "would ignore the distinction in coverage and priority between mine liens in AS 34.35.125 and the dump lien." This is an overly narrow interpretation of AS 34.35.140. The language of AS 34.35.140(a) explicitly incorporates all of the definitions of work contained in AS 34.35.125, along with other categories of labor, into its list of the types of work for which dump liens can be claimed. In other words, the definition of "work" in section .140 should be more expansive than that in section .125, not less so.[21]

The other basis for the superior court's decision was *Walbridge v. New York Alaska Gold Dredging Co.*, a territorial case which noted that liens were meant to cover "a person who is compelled to earn his daily

**16.** AS 34.35.060(c).

**17.** AS 34.35.120(10).

**18.** *McDonald–Weist Logging Co. v. Cobb*, 278 F. 167, 168 (9th Cir.1921).

**19.** *See, e.g., Donnybrook Building Supply Co. v. Alaska Nat'l Bank of the North*, 736 P.2d 1147, 1153–54 (Alaska 1987) (holding the mechanic's lien under AS 34.35.050–.120 to be the "exclusive remedy" for a company supplying building materials); *Frontier Rock & Sand, Inc. v. Heritage Ventures, Inc.*, 607 P.2d 364, 365–66 (Alaska 1980) (allowing assertion of mechanic's and materialman's liens by a contracting company); *Dannemiller v. AMFAC Distribution Corp.*, 566 P.2d 645, 653 (Alaska 1977) (allowing a corporate supplier of plumbing and electrical materials to record a materialman's lien under AS 34.35.050).

**20.** Both by statute and by precedent, the intent and purpose of lien laws are to be liberally construed once the determination of who qualifies as a lienholder is strictly construed. AS 34.35.930 ("The intent of this chapter is remedial and its provisions shall be liberally construed."); *H.A.M.S. Co. v. Electrical Contractors of Alaska, Inc.*, 563 P.2d 258, 262–63 (Alaska 1977) (holding that portions of Alaska lien statutes "which articulate mandatory conditions precedent to the very creation and existence of the lien" are to be strictly interpreted, whereas those portions "which are remedial in nature" are to be construed liberally).

**21.** The primary difference between the two sections is that section .125 places a lien "on the mine or mining claim," whereas section .140 places a lien "on the dump or mass." AS 34.35.125; AS 34.35.140(a).

bread by honest toil." [22] The Alaska case [23] and the Oregon case [24] on which the Alaska case relied distinguished between a supervisory employee and a physical laborer. While these cases, then, may say something about different types of labor, we do not agree with the superior court's reliance on them for the proposition that there is a distinction between the individual physical laborer and the tools that laborer uses.

The legislative history of AS 34.35.140(a) provides us with little guidance for determining whether the scope of work covered under the statute includes equipment costs. [25] Similarly, existing Alaska case law is of little assistance. [26] Therefore, we are forced to turn to other jurisdictions for guidance in interpreting the proper scope of a dump lien. While no other state has a dump lien separate from a mechanic's lien, [27] the decisions of other state courts do articulate principles that are applicable to the present case. To the extent that the issue is addressed under mechanic's lien statutes, cases in other jurisdictions support the contention that equipment costs can be included in a lien. The Oregon Supreme Court held that labor costs in a lien context include equipment and other related costs because these costs, even if nonlienable if taken separately, were anticipated by the buyer "in fixing the reasonable

---

**22.** 8 Alaska 36, 41 (D.Alaska. Terr.1928), *reversed on other grounds by New York Alaska Gold Dredging Co. v. Walbridge*, 38 F.2d 199 (9th Cir.1930) (relying upon *Durkheimer v. Copperopolis Copper Co.*, 55 Or. 37, 104 P. 895, 897 (1909)).

**23.** *Walbridge*, 8 Alaska at 39–40.

**24.** *Durkheimer*, 104 P. at 897.

**25.** The legislature changed the language of its dump lien statute in 1933 from a recovery "for the full amount of wages" to a recovery for "the amount due the laborer." (Compare the current AS 34.35.140 to COMPILED LAWS OF THE TERRITORY OF ALASKA 1913, sec. 164. The 1913 Alaska statute was taken from 36 Stat. L. 848, which also contains the phrase "for the full amount of wages.") This possibly suggests a desire for a more expansive interpretation of what fell under a dump lien under the new statute, though there is nothing in the legislative history to support this interpretation.

The current law is adapted from § 26–2–5 ACLA 1949, which uses the phrase "the amount due the said laborer." (The language throughout the statute has been "modernized" slightly, but with no apparent change in the meaning of the statute. It is not clear when these minor changes in the language took place.) This version of the statute was adopted in 1933. CLA 1933, § 2005. There is nothing in the legislative history to suggest why the amount due for the lien was changed from "for the full amount of wages" to "the amount due the laborer." The change took place as part of a larger bill on a variety of lien issues. The bill passed unanimously in both houses, though there were some House of Representatives amendments on an unrelated issue.

**26.** In *Mitchell v. Beaver Dredging Co.*, the court, in reference to the 1933 Session Laws that included the dump lien statute, stated that "[o]n the whole the acts of the Legislature have the very definite purpose of assisting the miner and

laborer to recover his wages." 8 Alaska 566, 572 (D.Alaska. Terr.1935). This perhaps suggests that a change in the language and scope of dump liens was not the primary focus of the legislature, as the reference to "wages" is preserved. At the same time, though, the passage from Mitchell is a rather general statement and does not necessarily imply that the change of "wages" to "amount due the laborer" was completely without meaning. Furthermore, the lien before the court in *Mitchell* was either a mechanic's or a miner's lien (both were referenced) and not a dump lien.

The remaining Alaska case law on this issue is no more helpful in determining how to interpret the definition of "work" in AS 34.35.140(a). *Donaldson v. Henning* held that materials and equipment use could not be included in a dump lien. 4 Alaska 642, 651 (D.Alaska. Terr.1913) (disallowing lien charges for purchase of a cable and use of a boiler). However, when this case was decided, the statute read as applying to "wages" instead of to "the laborer," so this case has no precedential value for interpreting the change in the statutory language. Similarly, *McConnell v. Empire Tin Mining Co.*, decided in 1916, maintained that the purpose of a dump lien is "the protection of the miner and the securing to him of his lien for wages." 5 Alaska 506, 509 (D.Alaska. Terr.1916). This case also cannot dictate a post–1933 interpretation of the dump lien statute.

**27.** Oklahoma has a statute specific to oil and gas wells which includes a lien on "the proceeds from the sale of oil or gas produced therefrom." OKLA. STAT. tit. 42, § 144. This statute, which applies both to those who provide services and to those who provide materials for the development of the mine, also places a lien on fixtures and equipment owned by the mining company, making it impossible to separate the elements that would apply strictly to a dump-specific lien as compared to more common mechanic's or materialman's liens.

value of the particular labor involved." [28] In other words, the buyer hired the construction subcontractor in large part because it could provide the heavy machinery necessary for completion of the project. As such, the lien should cover the charges for equipment actually used in and necessary to the project.[29] Similar conclusions were reached by Wyoming,[30] Oklahoma,[31] and Minnesota [32] courts.

 Absent precedent to the contrary, we decide the scope of "work" under AS 34.35.140(a) on the basis of reason, policy considerations, and the language of the statute.[33] In developing a contemporary mine, heavy machinery has, to a significant extent, replaced physical labor. Gone are the days of an army of pickaxes. To the extent that the legislature may long ago have meant to protect physical laborers by providing a lien on the dump produced by their labor in case they were not paid for those efforts, so should today's provider of heavy machinery be compensated for the work those machines supply. When Blattner was hired to develop the mine, it was hired not just to provide

**28.** *Timber Structures, Inc. v. C.W.S. Grinding & Mach. Works,* 191 Or. 231, 229 P.2d 623, 631 (1951).

**29.** *Timber Structures,* 229 P.2d at 630–31:
Labor, within the meaning of the lien statute, is no less labor because it is carried on with the use of expensive machinery instead of hand tools, and its reasonable value is not determined simply by the out-of-pocket payments by the employer to the employee. Plaintiff, as a subcontractor, *furnished labor* for this particular building *of a special kind* for the special purposes and needs of the structure. The question is what is the reasonable value of this particular labor, not some other. To be able to furnish this sort of labor, plaintiff was required to construct a plant, buy and install machinery, purchase power to operate the machinery, carry insurance, pay taxes, employ engineers, and incur other expenses. It also had to consider the profit and loss angle of its operations. *All of such expenses are a part of making this particular labor available and are increments of its value.*
(Emphasis in original.)

**30.** *United Pac. Ins. Co. v. Martin & Luther General Contractors, Inc.,* 455 P.2d 664, 674 (Wyo. 1969) (allowing equipment-related costs in the calculation of a lien and noting that "the basic principle underlying all mechanics' lien statutes is one of equity, that unconscionable and unjust enrichment should be prevented in the field of construction").

**31.** *Schraeder v. Gormley,* 127 Okla. 65, 259 P. 869, 872 (1927) (holding that a company hired to provide a rig for oil drilling operations possessed a lien on the well for the equipment it provided); *William M. Graham Oil & Gas Co. v. Oil Well Supply Co.,* 128 Okla. 201, 264 P. 591, 599 (1927) ("To hold that the statute gives to the one a lien for commodities furnished which become a part of the property, either by consumption in the use thereof, or by attachment as a part of the equipment or machinery or otherwise, and that it denies to the other who likewise furnished commodities [in this case, the costs of renting drilling machinery] equally as essential and necessary as furnished by the one, though such commodities furnished by the other be not consumed nor become a part of the properties developed by attachment, and retain individuality, and be capable of further use upon completion of the immediate purposes for which they were purchased, is to say that the lawmaking body of the state acted in a most discriminatory manner in the enactment of the statute, when it is known as a matter of common knowledge that a large quantity of such necessary and essential commodities never become a part of the leasehold either by consumption or attachment thereto.").

**32.** *Martin v. Wakefield,* 42 Minn. 176, 43 N.W. 966, 967 (1889) ("Remedial statutes are to be liberally construed to advance the remedy. The legislature could not have intended to exclude the use of those appliances or instrumentalities which are absolutely necessary to the performance of the various departments of labor enumerated in the statute. We are therefore of opinion that 'manual labor,' as used in this connection, includes the use and earnings of all implements, instrumentalities, or agencies, such as axe, cant-hook, team, or the like, which are actually used in and necessary to the performance of such labor by the lumberman or logger.").

**33.** *See Alderman v. Iditarod Properties, Inc.,* 32 P.3d 373, 380 (Alaska 2001) ("On questions of law, our duty is to adopt the rule of law that is most persuasive in light of precedent, reason, and policy.") (citing *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)); *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 904–05 (Alaska 1987) ("Our starting point in [interpreting a statute] is the language of the statute itself construed in light of the purposes for which it was enacted.... The goal of statutory construction is to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others. In this respect, we have repeatedly stated that unless words have acquired a peculiar meaning, by virtue of statutory or judicial construction, they are to be construed in accordance with their common usage.") (citations omitted).

physical labor but machinery as well. Because a corporation is considered a person under AS 34.35.140, equipment costs must be internalized into the labor that the corporation provides. For Blattner to be adequately compensated for the efforts it is expending, Blattner must therefore be allowed to include equipment costs in the amount due the laborer under AS 34.35.140(a).[34] These expenses are a vital part of the labor Blattner provides.

Blattner, however, may not include the entire cost of its heavy machinery in the dump lien. Alaska Statute 34.35.160, describing the requirements for filing liens, including dump liens, states that the party claiming the lien must provide an amount that it is claiming for the lien. If there is an amount stipulated for damages in the contract between the two parties, that amount is used. In the absence of an express contract, "the claim must state the reasonable value of the work and services."[35] There is no express contract contained in the record pro-

viding the compensation information necessary here.[36] Upon remand, the superior court should determine what, if anything, the service contract between Blattner and USMX provided as to compensation for equipment usage. It may be that the contract rate intermingles lienable and unlienable components to such an extent that it is of no use in determining the measure of the lien. If it is not practicable to determine the lienable amount of equipment charges in accordance with the terms of the contract, the superior court shall determine the lienable amount in accordance with the reasonable value of the work and services measure required by AS 34.35.160(c).

 Blattner argues that it should be allowed to recover its equipment costs according to an accelerated cost basis in which the value of the machinery is compressed into the truncated contract that resulted from USMX's bankruptcy. To allow Blattner to recover the full contract value of the equipment would remove from Blattner the

---

**34.** These costs include those expenses for supplies, such as food and fuel, necessary to the maintenance of the worksite and not incorporated into the contracted-for project. Without the necessary supplies, neither the human workers nor the heavy equipment could function properly. The cost of supplies is therefore an integral part of the amount due the laborer under AS 34.35.140(a) and, as such, can be included in the dump lien. This inclusion of supplies in the dump lien does not extend to materials, defined as those items and resources incorporated into the construction of the mine or well itself, or any surrounding buildings.

Blattner does not assert before this court a claim for materials supplied to the mining operation, though such an argument was raised before the superior court and rejected. To the extent that this claim is still valid, Blattner is not permitted to recover for the cost of materials in its dump lien. The furnishing of materials is, by statute, specifically contemplated in a materialman's lien. *See* AS 34.35.050(3). A materialman's lien attaches to the structures resulting from construction and hence is fundamentally different from a dump lien, which attaches to the mass of mined minerals. *See id.;* AS 34.35.140(a). Although we hold that equipment costs are included in Blattner's dump lien, there is no interpretation of the dump lien statute and its language of performing work that would allow incorporation of the cost of materials. Thus, the prospect of any recovery at all for the cost of materials can only be accomplished through a materialman's lien on the physical structures re-

maining at the mine. However, Blattner concedes that the only remaining interest in real property in dispute concerns the proceeds from the dump. Consequently, a claim for the cost of materials cannot be included in the present action.

**35.** AS 34.35.160(c).

**36.** While certain contract specifications for performance of the work and associated costs exist, the record does not provide sufficient information upon which to base a claim for damages in case of breach of contract. The record does contain a proposed contract by USMX used to solicit bids for the project, but there is no indication that this is the same as the contract agreed to by Blattner. The proposed contract states that payment will be made "for that part of the Work actually completed, including: (a) engineering; plus (b) material or equipment under fabrication in Contractor's own plant; plus (c) materials or equipment under fabrication in subcontractors' plants; plus (d) materials or equipment which have already been shipped; plus (e) construction, if any, completed to date on Site; less any payments previously made to the Contractor." Further, documents in the record, mostly letters between USMX and Blattner, involve negotiations over the terms of the contract, but no indication is given that this documentation is complete, nor does there appear to be any discussion of calculation of damages. Such a fact-intensive inquiry we leave to the superior court upon remand.

obligation to mitigate its damages. In the lien it filed on January 22, 1998, Blattner alleged that work had stopped on January 10, 1998. Yet, Blattner apparently took no action regarding the status or use of its machinery other than to file subsequent liens for standby costs. The superior court held that equipment costs could not be included in the dump lien and thus did not address the issue whether Blattner failed to mitigate the damages caused by Rothschild's breach. Alaska law requires that parties to a contract mitigate damages in situations of breach.[37] A determination of Blattner's obligation to mitigate damages and whether this obligation was met is left for remand.

Assuming there are no damages provisions in an express contract between Blattner and either USMX or Rothschild and assuming that Blattner failed to mitigate its damages, Blattner may only recover the quantum meruit value of the equipment costs[38] based on reasonable hourly schedules for the period of time in which the equipment was used.[39] The value of the equipment costs should be amortized over the full five-and-a-half years of the anticipated contract, with Blattner able to recover only for that period during which its lien is valid. Some determination will also need to be made as to what depreciation and other equipment costs are due to this particular project. Blattner claims this amount is $3,726,268. Blattner also claims a lien of $1,459,000 on residual equipment value. We reject Blattner's claim for residual equipment value because it falls outside the scope of a quantum meruit recovery.

Because the superior court held that non-labor charges could not be included in the dump lien, it did not make a determination of the validity of Blattner's expense claims. An accounting of the various charges reasonably attributable to the labor supplied for the development of the USMX mine and leaching pad will be necessary upon remand.

**2. Blattner's dump lien is limited to work performed in the nine months preceding January 10, 1998 and does not include subsequent standby costs.**

 Alaska Statute 34.35.145 limits the scope of a dump lien to "work performed within a period of nine months immediately before the cessation of the work." Noting that the lien Blattner filed on January 22, 1998 stated that work had stopped on January 10, 1998, the superior court held that Blattner's dump lien only secured the amount for labor performed between April 10, 1997 and January 10, 1998. We affirm this holding.

Blattner disputes the date of cessation of work on the grounds that it was engaged in standby work at the mine until February 26, 1999 and thus is owed $121,000 per month plus interest in standby charges for that time period. Blattner maintains that February 26, 1999 is the date work ceased because that was the day on which USMX's bankruptcy petition was dismissed.[40] Hence, according to Blattner, it was the day USMX "abrogated its contract" and thus "the first instance when Blattner could reasonably and lawfully conclude that mining operations had ceased." Blattner does not contend that it performed any work other than standby work on the mine following January 10, 1998. Consequently, the only real issue is whether standby charges can be incorporated into a dump lien. The trial court dismissed standby

---

37. *Alaska Children's Servs., Inc. v. Smart,* 677 P.2d 899, 902 (Alaska 1984) ("The duty to mitigate damages is a well-recognized rule of contract law in Alaska.").

38. *See Krossa v. All Alaskan Seafoods, Inc.,* 37 P.3d 411, 419 (Alaska 2001) ("When parties to a contract dispute do not have a valid contract, plaintiffs may generally recover in quantum meruit for services rendered. The measure of recovery in quantum meruit is the reasonable value of the services rendered to the defendant." (citations omitted)).

39. This time period will be discussed in the next section.

40. It is worth noting that under the nine-month rule set forth in AS 34.35.145, the February 26, 1999 date advocated by Blattner would likely be less favorable than the January 10, 1998 date adopted by the superior court if standby costs are held to be non-lienable. Blattner does not challenge the applicability of AS 34.35.145 to the present case.

charges as non-lienable because they "were incurred after the mine ceased operating."

Blattner contends that in Alaska's harsh winter climate, standby charges for the winter must be contemplated in virtually any construction contract. Standby charges are those expenses incurred while the services contracted for, in this case the use of heavy machinery, are idle. Blattner points out that the trial court, based on its finding that Blattner "worked continuously on the mine between March 1996 and November 1997," apparently accepted that Blattner worked during the winter of 1996–1997, when actual earthmoving and leaching were suspended. However, the mere fact that Blattner was allowed to incur standby costs in the past does not mean that it can continue incurring these charges indefinitely into the future.

 Alaska case law supports the availability of liens for standby charges. In *Fremming v. Southeastern Alaska Mining Co.*, the Alaska territorial district court held that a watchman and caretaker was a workman for lien purposes because "the work of a watchman and caretaker may not only be convenient to [the] future development, operation, work, or mining, but may in many instances be necessary to it."[41] In *Southeastern Alaska Mining Corp. v. Zavodsky*, the Ninth Circuit affirmed on appeal its decision that a watchman and caretaker's work was "necessary or convenient" as required by the 1915 lien statute and that he could therefore claim a mining lien, even though the mine had not been operational for five years prior to the time he began to serve his duties.[42] However, because the watchman at issue was hired "to preserve" the mining machinery on the property,[43] this case leads to the conclusion that a lien can be obtained for standby work only where that work is anticipated by the employer. In order for standby charges to be lienable, they must work toward the future development of the mine.[44] Standby charges, even where ordered by the employer, do not generate a lien where the standby charges are not contemplated in the plan for development and improvement of the mine.[45]

The events surrounding the first lien filing, though, defeat Blattner's claim for standby charges after January 10, 1998. When it recorded its first lien on January 22, 1998, Blattner was aware that the mining operations were falling apart.[46] In January 1998

41. 8 Alaska 309, 310 (D.Alaska. Terr.1931).

42. 60 F.2d 24, 26 (9th Cir.1932). The phrase "necessary or convenient" is now included in AS 34.35.125, which has been partially incorporated into AS 34.35.140(a), at least as far as types of lienable work are concerned. The relevant portion of AS 34.35.125 provides: "A person who, at the instance of the owner, ... performs any other class or kind of work necessary or convenient to the development, operation, working, or mining of the claim or well ... has a lien on the mine or mining claim, oil, gas, or other claim or well as security for the payment of the work."

43. *See Zavodsky*, 60 F.2d at 25–26.

44. *See id.* at 26 ("The fact that work had been suspended does not, in our opinion, restrict the application of the lien statute. It can be assumed that the very purpose of the employment by appellant of Fremming was to have the property guarded and protected until such time as mining operations might be resumed."); *cf. Colonial Supply Co. v. Smith*, 134 Okla. 40, 272 P. 879, 880–81 (1928) (holding that one employed to guard idle oil well tools possessed a lien for his services); *Skinner v. Quadrangle Oil Co.*, 112 Kan. 742, 212 P. 684, 686 (1923) (holding that a lien could include "waiting time" because under the contract this time "must be considered as a part of the labor necessary to drill the well").

45. *See United States for Use of E. & R. Constr. Co., Inc. v. Guy H. James Constr. Co.*, 390 F.Supp. 1193, 1246 (D.Tenn.1972), *aff'd by United States v. Guy H. James Constr. Co.*, 489 F.2d 756 (6th Cir.1974) ("Those items of plaintiff's claims which involve damages for stand-by time of equipment are not properly recoverable under the Miller Act."); *Kerr–McGee Oil Indus., Inc. v. W.J. McCray*, 89 Ariz. 307, 361 P.2d 734, 737 (1961) (overturning a lien for standby machinery because the machinery "did not contribute to the improvement of the property and hence was not within the manifest purpose of the statute"); *Nelson v. Boise Petroleum Corp.*, 54 Idaho 179, 32 P.2d 782, 783–84 (1934) (holding that an employee was not entitled to a lien for time in which he was idle, though he could still recover contract damages); *Blake v. Crystaline Lime Co.*, 37 Idaho 637, 221 P. 1100, 1101 (1923) (holding that persons employed but not performing work were not entitled to a lien for time after completion of actual work).

46. Blattner contends that the trial court believed that the mine remained in operation at least until

Blattner had been ordered by USMX to suspend its operations, which is apparently the source of its claim to have stopped work on January 10, 1998. Having claimed that it had ceased work, Blattner was no longer a laborer and thus could no longer claim a lien for the amount due the laborer under AS 34.35.140(a). Blattner did assert in its first lien filing that the lien would increase due to equipment maintenance, demobilization costs and standby time, but charges for these items are framed as being separate from the work which Blattner claims to have ceased and thus present a separate question of lienability.

Furthermore, Blattner's later liens were solely for either equipment standby time or for "unreimbursed fixed equipment costs," suggesting that Blattner wanted to recover for the depreciation and inactivity costs of its expensive machinery. Because they were not anticipated in the plan for development of the mine, these charges are not "work" as contemplated by the Alaska dump lien statute. Having known that the mining operations were in serious trouble, Blattner should not be allowed to prolong indefinitely the charges it levied on USMX by neglecting to put the machinery to other uses. As with the discussion of quantum meruit recovery, Blattner was under an obligation to mitigate its damages once work on the mine ceased. Though the initial plan for developing the mine contemplated a five-and-a-half year timeframe, any work on the mine had stopped by the time Blattner filed its first lien.[47] There are no findings by the superior court that Blattner subsequently undertook any actions to mitigate its damages.

Evidence may be presented on remand that efforts at mitigation either were made or were impractical, but charges for equipment standby time do not create an independent basis for recovery. The denial of a lien for standby charges does not necessarily preclude the possibility of contract damages for Blattner,[48] but a lien can only cover improvements or anticipated improvements to the mine.[49] The measure of the value of the work and services to the mine as defined by AS 34.35.140 and AS 34.35.125 is either a contract measure or, if there is no such measure or it is unworkable, the reasonable value of the work and services.[50] We hold that Blattner ceased work on the mine on January 10, 1998 and can only recover charges under its dump lien for work performed in the preceding nine months.

3. **Blattner can only include in its dump lien those supervision and management charges derived from on-site labor.**

Blattner asserts it should also be able to include in its dump lien expenses related to supervision or management of the mining operations. The superior court held that because AS 34.35.140(a) incorporates AS 34.35.125 into its definition of "work," Blattner may recover for supervisory work "necessary or convenient" to the development and operation of the mine. Rothschild contends that this creates an almost limitless definition of "work," whereby supervisors in remote locations could obtain liens with priority over those obtained by the manual laborers at the site.[51] We hold that superviso-

USMX filed for bankruptcy protection on May 21, 1998. This might be a more appropriate date for termination of the standby work by Blattner were it not for Blattner's own admission that it ceased work on January 10, 1998. *See Kerr–McGee*, 361 P.2d at 738 (holding that work ceased when both parties were of the belief that "there was nothing further to be performed even though the well had not been completed"). If the May 21, 1998 date were to have been adopted, the nine-month limit of AS 34.35.145 would be applied to that date.

47. Indeed, the trial court held that Blattner had ceased work in November 1997, though it allowed recovery for the lien from the nine months

prior to the January 10, 1998 date set forth in the first lien.

48. The contract between Blattner and USMX includes a monthly charge of $121,000 for periods when the equipment is in standby mode. The issue of whether Blattner can recover contract damages for its standby costs is not before this court.

49. *See Zavodsky*, 60 F.2d at 26.

50. AS 34.35.160(c).

51. Rothschild admits that this would only be applicable if the corporate entity of Blattner had not filed a lien claim.

ry labor can be included in a dump lien, but only when the labor is performed at or adjacent to the mine site.

The statute at issue, AS 34.35.140(a), requires that the work for which the lien is acquired be performed "upon, in, or about the mine." In some of its lien claims, Blattner asserts that all of the work, including "supervision," was "performed in, on, or about the [mine]." However, Blattner also asserts in its brief that it should be allowed to include in its lien expenses for such workers as Fairbanks payroll clerks and Anchorage expeditors who assist with shipments. Blattner thus clearly seeks the inclusion of charges for some off-site labor. Blattner contends that the phrase "upon, in, or about the mine" should be read to encompass off-site work performed in a broad geographic area.

If equipment-related expenses are to be included in "the amount due the laborer," [52] it is hard to imagine why supervision and management charges would not be included. Certainly, supervision and management expenses can be incorporated into the contract for services in the same way as are equipment-related expenses. The construction and maintenance of the mine could not take place without some form of supervision. As mining technology becomes increasingly advanced, with additional emphasis on computers and heavy machinery, more labor can be classified in some sense as supervisory.

However, these supervisory charges cannot be extended infinitely to cover all of Blattner's expenses. If the phrase "upon, in, or about the mine" is to be of any import, it must be to place some sort of limitation on the scope of labor for which a dump lien can be levied. While Blattner's payroll clerks and expeditors may aid in the development of the mine, they do not perform the direct work on the mine that the dump lien is meant to protect.

**52.** AS 34.35.140(a).

**53.** AS 34.35.140(a).

**54.** AS 34.35.125.

**55.** *Id.*

In describing who can assert a dump lien, AS 34.35.140 lists those who perform work "in the production, piling up, or storing of a dump or mass of mineral." [53] The statute, then, refers not so much to those activities tangentially necessary to the development of the mine as to work performed on the physical mine itself or the physical dump extracted from the mine. This is consistent with the types of work listed in AS 34.35.125 and subsequently incorporated into AS 34.35.140(a). This list includes work "opening up, developing, sinking, drilling, drifting, stoping [sic], mucking, stripping, shoveling, mining, hoisting, firing, cooking, [and] teaming." [54] This list of activities focuses on direct labor on the physical mine. The statute further lists as work those activities "tending to or assisting in the development, extraction, separation, or reduction to a commercial value of the minerals" and activities involving "work on a water right, ditch, flume, pipe line, tramway, tram, road, or trail, used in connection with the opening up, or to facilitate the opening up, operation, or development of the claim or well, or the extraction of the minerals." [55] This list of activities similarly implies work done directly on the mine itself. While AS 34.35.125 includes as work "any other class or kind of work necessary or convenient to the development, operation, working, or mining of the claim or well," this does not imply an absence of a direct connection to the development of the mine. Rather, the phrase is better interpreted as incorporating into the definition of "work" those activities similar to the ones listed but not specifically mentioned.

The type of work implied by this restriction includes supervisory work performed at the mine site because this work is performed directly on the mine and has a direct impact on the construction and maintenance of the mine.[56] As such, supervisory labor falls

**56.** *See Amarex, Inc. v. El Paso Natural Gas Co.,* 772 P.2d 905, 910 (Okla.1987) ("Managerial functions qualify as labor within the mechanic's lien statute.... Even under a strict construction of the statute, there appears to be no reason why the services performed in the operation of an oil and gas well should not be within the 'labor and services' provision of 42 O.S.1981 § 144.").

within the spirit of the activities meant to be protected in AS 34.35.125 and AS 34.35.140(a). It does not, however, include the labor of off-site payroll clerks, expeditors, or other general employees of the company. The work that these people perform may to a certain extent be necessary to the development of the mine but their work is peripheral to the physical mine itself and more akin to the standard overhead costs that any business incurs.

This distinction between direct and indirect labor is consistent with case law in Alaska and other jurisdictions. In *Walbridge v. New York Alaska Gold Dredging Co.*, the Alaska district court held that a person employed by the board of directors as a "superintendent and general manager of the business and properties owned by the corporation in the Bethel precinct" [57] could not exercise a lien on the mine or on the dump resulting from the mine because his activities "were more in the nature of an executive officer ... than a person who is compelled to earn his daily bread by honest toil." [58] In reaching this decision, the court relied upon an Oregon case denying a lien to a "superintendent and general manager" because allowing liens for non-physical labor would allow the upper management to vote themselves salaries, and hence liens, even though they did not perform actual labor upon the mine. [59] The *Walbridge* court further relied upon a United States Supreme Court case holding that a foreman who "planned and personally superintended and directed the work, with a view to develop the mine and make it a successful venture," could possess a lien on the mine. [60] The Supreme Court was careful to distinguish the labor of the foreman from that of a general superintendent. [61] The distinction between a foreperson and a general superintendent is analogous to the limitation of the dump lien to direct work on the mine that we establish today. This holding is also consistent with those from other jurisdictions. [62]

While we hold that supervisory charges must be restricted to on-site services, we do see a need for limited flexibility in the determination of what counts geographically as being "on-site." More specifically, supervisory work need not be performed on the property legally owned by the owner of the mine; rather, it also includes work performed on land that is adjacent to the site of the mine, especially where convenient for the development of the mine. In *McConnell v. Empire Tin Mining Co.*, the court held that a laborer employed by a mining company to maintain a mill and water ditch for the mines possessed a lien on the mines, even though the mill was about two miles away from the mines, because the work was integral to the development of the mine and because this "was probably the closest suitable site for such

**57.** 8 Alaska 36, 37 (D.Alaska. Terr.1928), *rev'd on other grounds by New York Alaska Dredging Co. v. Walbridge*, 38 F.2d 199 (9th Cir.1930).

**58.** *Walbridge*, 8 Alaska at 41.

**59.** *Walbridge*, 8 Alaska at 39 (citing *Durkheimer v. Copperopolis Copper Co.*, 55 Or. 37, 104 P. 895, 897 (1909)).

**60.** *Walbridge*, 8 Alaska at 40 (citing *Mining Co. v. Cullins*, 104 U.S. 176, 177, 26 L.Ed. 704 (1881)).

**61.** *Walbridge*, 8 Alaska at 40 (citing *Flagstaff Silver Mining Co.*, 104 U.S. at 178).

**62.** *Compare White v. Constitution Mining & Mill. Co.*, 56 Idaho 403, 55 P.2d 152, 158 (1936) (holding that a worker who "was employed in looking after and taking care of the property and ... personally planned, mapped out, laid out, and determined the work to be performed at the mine, and inspected the property for the purpose of determining that the mine was being properly cared for and preserved" possessed a lien on the mine), *and Hahn v. Anaconda Gold Mining Co.*, 26 S.D. 218, 128 N.W. 128, 128–29 (1910) (allowing a lien for a superintendent and general manager who "during a greater portion of his said employment ... was required to be upon the mining claims of defendant"), *with Wintermote v. MacLafferty*, 233 F. 95, 96 (9th Cir.1916) (disallowing a lien for an executive whose duties in the company included supervision of workers, repairing machinery, and directing sales), *Hulsey v. LaMance*, 73 Ariz. 430, 242 P.2d 554, 556 (1952) (holding that an employee who maintained equipment and showed land to potential investors did not qualify for a laborer's lien against the mining property), *and Manpower, Inc. v. Phillips*, 173 Ohio St. 45, 179 N.E.2d 922, 925–26 (1962) (holding that a company that furnished laborers who worked under direction of contractor was not itself a laborer within the mechanic's lien statute).

mill." [63]

Although the present case does not involve a public construction project,[64] we choose to adopt the logic of *Board of Trade, Inc. v. State, Department of Labor,* where we held that the definition of "on-site" includes those locations "in close geographic proximity to the project footprint." [65] The determination of whether "adjacent" or "nearby" activities can be considered part of the project must be made on a case-by-case basis and take into account "whether the activity could have been carried out at an alternative site closer" to the project.[66] The interpretation contained in the Alaska Administrative Code provides a reasonable elaboration of this issue when it specifies that in order for a location or activity to be considered on-site it must be "dedicated exclusively or nearly so to performance of the contract." [67] The code specifically exempts from the definition of "on-site" activities at those locations which "are governed by ... general business operations," even if the activities focus on construction of a particular project.[68] We conclude that the logic behind this interpretation should apply to the present case in determining what activities are to be considered on-site for purposes of the dump lien. More exact determinations will be necessary upon remand.

### C. Blattner's $500,000 Protection Payment Applies Against Its Dump Lien.

Blattner argues that it should be allowed to assign the $500,000 "adequate protection payment," received from USMX via a stipulation agreement with Rothschild on August 2, 1998, to the mining liens that Blattner possessed under AS 34.35.125. The superior court discussed the $500,000 protection payment not in terms of whether it could be assigned to particular liens but in terms of whether the payment could be assigned to unsecured as opposed to secured debt. Noting that the payment was made pursuant to a bankruptcy hearing, and thus under the guidelines set forth in 11 U.S.C. § 363, the superior court held that the protection payment must be applied first against secured claims so as to "replace the lost value of collateral suffered by the secured party." Consequently, the superior court held that Blattner must use the protection payment to reduce the amount owed under its dump lien.

▮▮▮▮ Blattner does not challenge this finding on appeal. Apparently conceding that the protection payment must be applied to a secured claim, Blattner contends that it is allowed to use the protection payment to reduce the mining liens it possessed at the time but which now have been extinguished by the transfer of the mine to state ownership, leaving the dump lien claim at its full amount.[69] In support of its argument, Blattner relies upon *Jalasko Associates, Inc. v. Newbery Energy Corp.,* which states that absent a requirement to the contrary by the debtor, "a creditor [is permitted to] apply a debtor's payment to any of the debtor's obligations." [70]

**63.** 5 Alaska 506, 508–09 (D.Alaska. Terr.1916).

**64.** Consequently, the Little Davis–Bacon Act (AS 36.05.010–110), the applicable definition of "public construction" as being "on-site" (AS 36.95.010(3)), and the interpretation of "on-site" in 8 Alaska Administrative Code (AAC) 30.910 (2000) are not binding on the present case.

**65.** 968 P.2d 86, 92 (Alaska 1998).

**66.** *Id.* at 92–93.

**67.** 8 AAC 30.910(a); *see also* 8 AAC 30.910(b) ("[L]aborers, mechanics, or field surveyors who are engaged by a person or business that is hired or contracted by a prime construction contractor or subcontractor to provide services which are integral and necessary to the construction pro-

ject shall be considered 'on-site' in the performance of those duties which the contractor or subcontractor was required to perform.").

**68.** 8 AAC 30.910(c).

**69.** Rothschild asserts that Blattner did not make this argument at trial and thus should be precluded from making it here. Arguments not raised in the trial court are waived on appeal except where plain error has occurred. *Wettanen v. Cowper,* 749 P.2d 362, 364 (Alaska 1988). However, while not a focus of its argument below, Blattner sufficiently raised the issue by asserting mechanic's and mining liens against which Blattner now argues the $500,000 payment should apply.

**70.** 663 P.2d 946, 948 (Alaska 1983).

The facts of the present case, however, make it necessary to determine whether from a legal standpoint Blattner could apply its protection payment to the lien of its choice. It is true that Blattner filed both a mining lien and a dump lien. However, the two liens were not really separate, as Blattner argues, because each claimed the same work. Indeed, in every instance, the mining lien and the dump lien were part of the same document, with both the dump and the mining liens covering the same amount and demand pursuant to AS 34.35.160.

The superior court held, and Blattner alleges, that the lien filings included a claim for a mechanic's lien. This is not reflected in the record, as the liens filed make no express reference to a mechanic's lien. Instead, only mining and dump liens are explicitly claimed.[71] On remand, the superior court will need to re-examine the costs recoverable under the different liens, including any mechanic's liens that might be found. If there are differences in the type of debt properly recoverable by Blattner under each lien, an allocation of funds to the repayment of one lien would not necessarily reduce the recoverable debt under the other liens.

If no such differences can be found, the adequate protection payment of $500,000 will be used to reduce the overall debt owed to Blattner. Absent differences in the source of the debt to be recovered, Blattner in essence would have recorded two different liens by which it sought to recover the same indebtedness.[72] The $500,000 "adequate protection" payment was to be directed toward reducing the principal in the outstanding debt owed by USMX to Blattner. Because the source of the indebtedness was apparently the same for both liens, any reduction in indebtedness for the mining lien should result in a corresponding reduction in indebtedness for the dump lien. Blattner's claim is therefore effectively moot. To allow Blattner to apply the $500,000 protection payment to its mining lien and still retain the full indebtedness on its dump lien would be to allow Blattner to profit by a phantom $500,000.

**D. Blattner May Recover Reasonable Attorney's Fees for Enforcing its Dump Lien.**

 The superior court awarded $230,500 in attorney's fees to Rothschild under Alaska Civil Rule 82(b)(1). It did not explain the reasoning behind this award. The superior court later awarded Rothschild

---

**71.** Each lien contained in the record begins with the following statement:

The undersigned, D.H. Blattner & Sons, Inc . . . . claims a mining lien upon the mineral property more commonly known as the Roundtop Upland Mining Lease, as more particularly described below; and separately and in addition, claims a mining lien upon the dumps or masses produced from, or piled or stored upon, said leased real property, including the minerals contained therein or extracted therefrom (hereinafter the "dump or mass").

Each lien claim also ends with a similar statement:

The Claimant therefore claims a lien against the property that is leased, and separately claims a lien against the masses or dumps for the amount due, plus costs, reasonable attorney's fees, and interest.

These passages refer to two, and only two, distinct liens, describing them in terms akin to a mining lien and a dump lien. Though some of the work described elsewhere in the liens might be recoverable under a mechanic's lien, such a lien does not appear to have been claimed. Furthermore, Judge Savell limited Blattner's lien claims to "the two [liens] filed and recorded January 27, 1998," which contain the above passages and no separate reference to a mechanic's lien.

**72.** Indeed, as the superior court notes, both the mine and the dump were transferred to state control on July 12, 1999, so the only thing that Blattner and Rothschild are disputing is the distribution of the amount in the Norwest Bank Colorado account resulting from the sale of gold and silver acquired from the dump. Yet, Blattner recorded its liens from January 22, 1998 to April 8, 1999, when the mine and dump were potentially being contested, so the transfer of the dump and mine to state control does not per se defeat Blattner's argument here.

Rothschild alleges that the protection payment was intended to protect against the depletion of the cash proceeds and that consequently Blattner could not apply the payment to the mining lien and possibly not even to the dump lien. This misconstrues the situation. The cash proceeds from the mine and dump are only a proxy for the debt owed by USMX to Blattner for which Blattner has claimed mining and dump liens. To the extent that these liens are valid, the payments made to Blattner are to be used to reduce the indebtedness secured by these liens.

an additional $43,307.35 in costs. Trial courts are granted great discretion in awarding attorney's fees.[73] An award of attorney's fees is only overturned if it is "manifestly unreasonable,"[74] a standard equivalent to an "abuse of discretion."[75] However, because this case is being remanded on a variety of issues, the underlying suppositions on which the superior court initially awarded attorney's fees are no longer valid. Consequently, this award must be vacated.

■■■■■■ Furthermore, the applicable authority for attorney's fees in this case is not Civil Rule 82(b)(1), the authority relied upon by the superior court, but rather AS 34.35.005(b). Civil Rule 82 is not applicable where a statute provides for other means of awarding attorney's fees.[76] Such other means exist in the present situation. A separate statute for recovery of attorney's fees for enforcing a lien, AS 34.35.005(b), provides: "In an action to enforce a lien, the court shall allow as part of the costs all money paid for drawing the lien and for filing and recording the lien claim, and a reasonable attorney fee for the foreclosure of the lien." We have previously noted that AS 34.35.005(b) applies to the dump lien statute in AS 34.35.140.[77] Because Blattner is bringing an action to enforce a dump lien, it is entitled to the recovery of preparation costs and attorney's fees as outlined in AS 34.35.005(b). The $500,000 Blattner has received as a protection payment shall be considered a part of Blattner's lien recovery in determining reasonable attorney's fees since the payment was meant to offset Blattner's lien claim. Blattner need not prevail on all of its claims in order to satisfy the requirements of AS 34.35.005(b).[78] Rather, we interpret AS 34.35.005(b) as providing for a mandatory award of attorney's fees whenever a party is successful in enforcing a lien created by AS 34.35.005 to AS 34.35.425.[79] A determination of reasonable fees is to be made upon remand.[80]

## V. CONCLUSION

There are six central issues at dispute in this case. We hold as follows: Because of the stipulation agreements entered into by both Blattner and Rothschild, Blattner's dump lien attaches to the Norwest Bank Colorado account; Blattner can include the cost of heavy machinery in its dump lien under AS 34.35.140; Blattner cannot include unanticipated standby charges in its dump lien; supervisory charges can be included only if they are on-site; Blattner, subject to remand for further findings on applicable liens, must apply the $500,000 protection payment against the amount for which it claims a dump lien; and Blattner is entitled to reasonable attorney's fees for enforcing its lien. We REMAND to the superior court for proceedings consistent with this opinion.

**73.** *Girves v. Kenai Peninsula Borough*, 536 P.2d 1221, 1227 (Alaska 1975) (asserting that trial courts have "wide discretion" in determining attorney's fees); *Owen Jones & Sons, Inc. v. C.R. Lewis Co.*, 497 P.2d 312, 314 (Alaska 1972) (holding that the determination of who is the prevailing party and who should be awarded attorney's fees is within the discretion of the trial judge).

**74.** *Girves*, 536 P.2d at 1227; *Froelicher v. Hadley*, 442 P.2d 51, 53 (Alaska 1968).

**75.** *United Servs. Auto. Ass'n v. Pruitt*, 38 P.3d 528, 531 (Alaska 2001); *Froelicher*, 442 P.2d at 53.

**76.** Alaska Civil Rule 82(a) provides: *"Except as otherwise provided by law* or agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule."* (Emphasis added.) *See also Gamble v. Northstore Partnership*, 28 P.3d 286, 288 (Alaska 2001) (holding that "Civil Rule 82 may be overridden" by statute or agreement); *Bobich v. Hughes*, 965 P.2d 1196, 1200 (Alaska 1998) (holding that a statutory provision for attorney's fees in an overtime compensation case trumped Civil Rule 82).

**77.** *See Brand v. First Fed. Sav. & Loan Ass'n of Fairbanks*, 478 P.2d 829, 833–34 (Alaska 1970).

**78.** *Brand*, 478 P.2d at 834 (holding that the trial court had in that instance properly set off the fees for one party's lien enforcement claims against the successful claims of the other party).

**79.** *See Boyd v. Rosson*, 713 P.2d 800, 802 (Alaska 1986) (holding that "full fees should be awarded to successful lien claimants [under AS 34.35.005(b)] so long as the fees are reasonable"); *Brand*, 478 P.2d at 833–34.

**80.** *See Boyd*, 713 P.2d at 802.